**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name:  07a0623n.06
Filed:  August 27, 2007

**No. 06-1019**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| NATHAN PAUL HANNA, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF MICHIGAN |
| JANETTE PRICE, | ) | |
| | ) | |
| Respondent-Appellant. | ) | |

Before:  DAUGHTREY and COLE, Circuit Judges, and RESTANI,[*] Judge.

MARTHA CRAIG DAUGHTREY, Circuit Judge.  Respondent Janette Price, warden of the Michigan state prison facility in which petitioner Nathan Hanna is serving a life sentence, appeals the order of the district court issuing a conditional writ of habeas corpus to Hanna.  The district court's decision to grant relief is based on the Michigan state courts' unreasonable application of federal law on three grounds: (1) the introduction at trial of a confession that was secured at a time when the petitioner was incapable of executing a valid waiver of his *Miranda* rights, (2) repeated instances of prosecutorial misconduct at trial, particularly in the denigration of the petitioner's insanity defense, and (3) ineffective

---

[*]The Hon. Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

assistance of counsel in the failure to object to obvious instances of that prosecutorial misconduct. After our study of the record, the magistrate judge's report (aptly described by the district judge as a "thoughtful and thorough analysis of Petitioner's claims"), the district court's opinion adopting that report, and the briefs and arguments of the parties, we find no basis on which to overturn the district court's decision. We therefore affirm the judgment below, largely for the reasons given in the magistrate judge's report and the district court's opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts of the underlying crime, while undeniably tragic, were not seriously disputed at trial – indeed, there is no question that the petitioner was the person who killed the victim in this case. Nathan Hanna was a newspaper carrier at the Sault Sainte Marie Evening News, when on July 23, 1998, he calmly entered the newspaper's offices carrying a shotgun and fatally shot the paper's circulation manager, Tony Gillespie, in front of a number of witnesses. The only apparent motive for the murder was Hanna's delusional belief that Gillespie was the anti-Christ and that he had to murder Gillespie in order to bring about what he referred to as the "Second Coming."

After shooting Gillespie, Hanna drove to a wooded area where he remained for three days, waiting, he said, for God to give him further instructions. He did not eat or drink during this time or shelter himself from the elements. After three days, on July 26, Hanna

emerged from the woods and was shot three times by police, who were combing the area in order to find and arrest him.

Two days later, on July 28, Sault Sainte Marie Police Detective Michael Whitney and Detective Sergeant Price interviewed Hanna in the intensive care unit of the local hospital where Hanna had been taken after he was shot. At that point, Hanna had been out of surgery for about eight hours and was recovering from gunshot wounds that the police had inflicted to his chest, abdomen, and leg. He had tubes running into his nose; he was hooked up to an IV; he was on narcotics, had not had anything to eat for almost five days, and was suicidal and extremely mentally ill. Before the interview, Whitney received authorization from the nurse to speak with Hanna and read Hanna the warnings required by the decision in *Miranda v. Arizona*, 384 U.S. 436 (1966). Whitney later testified that Hanna indicated that he wanted to waive his rights, although he was unable to speak above a whisper. Indeed, his breathing was later described as louder than his voice.

Although Hanna was able to communicate with the officers during the interview, his answers to their questions were not clearly responsive but instead expressed obviously delusional beliefs and were sometimes confused and nonsensical. Of later significance, the officers asked Hanna about his understanding of the wrongfulness of his conduct and, according to their testimony, he appeared to have agreed with their assessment that his conduct was "wrong," "bad," and "illegal." Later in the day, Hanna was also questioned by Detective Sergeant Robin Sexton and again waived his *Miranda* rights. This interview was

interrupted by the arrival of Hanna's court-appointed counsel, who advised Hanna not to answer any more questions. Sometime after this, and out of the presence of Hanna's counsel, Sexton attempted to re-initiate the interview, but Hanna refused to speak any further based on his attorney's advice.

The petitioner filed a motion to suppress his two statements to police. At the subsequent suppression hearing, Dr. Robert Mogy, a court-appointed expert in forensic psychology, testified for the defense that Hanna was obviously mentally ill and delusional. Of central importance was Mogy's testimony that he had spoken with Hanna about Hanna's statements to police that he had done something "wrong" and "bad" and had discovered that Hanna was referring to the fact that the Second Coming had not taken place immediately after the shooting. It was the failure of this event to occur that apparently led Hanna to believe that something was "wrong" and that what he had done was "bad." Mogy also testified that, in his opinion, Hanna's mental and physical condition was such that he was not able to think through the decision to waive his Miranda rights.

Jill Halsey, a nurse who tended to Hanna the night before he was interviewed, also testified at the suppression hearing, describing the serious nature of Hanna's wounds, reporting that Hanna had attempted to commit suicide by holding a pillow over his face, and indicating that Hanna believed that the doctors were poisoning him through his nasal/gastric tube. She also testified that prior to the police interviews, the defendant had

not been allowed to eat or drink because of his surgery. Despite this testimony, the trial court denied the motion to suppress.

At trial, the only contested issue was Hanna's mental state at the time of the offense. Recognizing that the defendant was obviously impaired, the prosecution argued that Hanna should be found "guilty, but mentally ill," an option under Michigan law since 1975 that, at least theoretically, requires imposition of a conventional sentence and incarceration but entitles a convicted defendant to "evaluation and . . . such treatment as is psychiatrically indicated for his mental illness or retardation." M.C.L.A. 768.36(3). However, the state presented no expert testimony whatever concerning the defendant's mental condition. By contrast, Hanna interposed the defense of insanity which, if successfully established, would of course mean that the requisite mens rea was lacking and would require a verdict of not guilty. Defense counsel presented the testimony of four expert witnesses, all of whom provided testimony in support of Hanna's insanity defense. Dr. Mogy was among this group, and he testified that, in his expert opinion, Hanna was legally insane at the time he killed Tony Gillespie. He also reiterated his testimony that Hanna's statements that he had done something "bad" and "wrong," taken in context, did not refer to an admission by Hanna that he understood killing Gillespie was morally or legally wrong in the abstract but, instead, reflected Hanna's confusion that the anticipated Second Coming had not occurred despite his personal efforts to bring it about.

In rebuttal, the prosecution offered only the testimony of Tony Gillespie's three adult children, who were marginally acquainted with Hanna through their father. They all testified that Hanna appeared "normal" in their interactions with him, and none testified as to any animosity between Hanna and Gillespie. The prosecution also relied on Hanna's concession that he had done something "bad" and "wrong" in arguing its case against insanity.

The jury found Hanna guilty of first-degree murder, but mentally ill, and he was sentenced to life imprisonment without the possibility of parole. Post-trial, newly appointed counsel moved for a new trial raising several issues, including those now before this court. The trial court held a hearing in which Hanna's trial counsel testified that Hanna's was the only murder case she had defended. She also testified about a note in Hanna's medical records that stated, "Further pain medication held per request of the detective to facilitate communication," explaining that she was aware of the note prior to the suppression hearing but had not managed to get it into evidence. The note was entered into the record as a defense exhibit at the post-trial hearing. The trial court found no basis on which to order a new trial on any of the issues raised and denied the motion.

The Michigan Court of Appeals affirmed Hanna's conviction and the Michigan Supreme Court denied Hanna's application for leave to appeal. Hanna then filed the instant petition in federal district court. From the district court's conditional grant of habeas relief, the respondent now appeals.

## DISCUSSION

Our review in this habeas case is governed by the standards set out in the

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214

(1996), which permits a federal court to grant a writ of habeas corpus only when the state

court judgment:

> (1) resulted in a decision that was *contrary to*, or involved an *unreasonable application* of, *clearly established* Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).  The statute itself mandates a high level of

deference for state court factual findings.  *See* § 2254(e)(1) ("[A] determination of a factual

issue made by a state court shall be presumed correct [and] [t]he applicant shall have the

burden of rebutting the presumption of correctness by clear and convincing evidence.").

We review the district court's legal conclusions *de novo*, its factual findings for clear error,

and mixed questions of fact and law  *de novo*.  *See Lott v. Coyle*, 261 F.3d 594, 606, 610

(6th Cir. 2001).

The district court held that the Michigan Court of Appeals "unreasonably applied

clearly established federal law" when it found that Hanna's waiver was voluntary.  The

district court noted the appeals court's ruling that the question of voluntariness had not

been raised in the state trial court, but pointed out that the appeals court had nevertheless

addressed the issue on the merits. That discussion was peculiarly inadequate, however, because the court addressed only the note in the medical charts concerning the request by police that "further pain medication [be withheld] per request of detective to facilitate communication," a piece of evidence that had not actually been introduced at trial. The Michigan court rejected the defendant's argument that the police had threatened to withhold medication as an interrogation tactic, saying that it discerned "a less troubling explanation for the detective's request: that the detective asked that Hanna not be sedated to the point where he could no longer listen and speak coherently." But, as the magistrate judge pointed out in his report to the district court, the appeals court "did not . . . address the other issues of police coercion raised on direct appeal and in this habeas petition," specifically:

> that police, in taking the statement were aware of the following: (1) that Petitioner was in the ICU recovering from multiple gunshot wounds and surgery within the past eight hours; (2) that he had tubes in his nose and throat; (3) that he was medicated with Demerol and other drugs; (4) that police officers admitted he was in pain; (5) that he advised officers he had not eaten in three days; (6) that he could barely be heard over the sound of his own breathing; and (7) that his thought processes were sufficiently delusional to make officers inquire into his competence.

From all of this, the magistrate judge recommended that the district court find the resulting statement involuntarily obtained.

The district court did so, concluding that the holding of the state court was "in direct conflict with a line of Supreme Court cases establishing that a law enforcement officer's

knowledge of a suspect's physical and mental condition prior to questioning may be sufficient to establish the necessary police conduct to constitute a due process violation" and citing *Colorado v Connelly*, 479 U.S. 157 (1986); *Mincey v. Arizona*, 437 U.S. 385 (1978); *Townsend v. Sain*, 372 U.S. 293 (1963) *overruled on other grounds by Keeny v. Tomayo-Reyes*, 504 U.S. 1 (1992); and *Blackburn v. Alabama*, 361 U.S. 199 (1960). The district court held, correctly we conclude, that the Michigan Court of Appeals's failure to consider the claim in light of those cases "rendered the court's decision an unreasonable application of Supreme Court precedent."

The district court further held that the state court's finding that Hanna's statements were knowing and intelligent was undermined by "an unreasonable determination of the facts in light of the record in the state court proceeding." That record contained testimony that Hanna had not had food or water in the almost five days since Gillespie's murder, a fact that Hanna apparently conveyed to the officers during the interview. However, the Michigan Court of Appeals "quickly dismissed Petitioner's lack of food and water because it was a consequence of his decision to flee after his crime and because 'the nasal/gastric tube indicates, rather obviously, that Hanna was receiving nourishment through that mechanism.'" The district court emphasized that the cause of the petitioner's lack of food and water was irrelevant to the question of the impairment to his physical and mental condition and pointed out that the record established that he was not, in fact, receiving any nourishment from the gastric tube. It is virtually impossible to conclude, under the totality of the circumstances outlined above, that Hanna was able to think rationally such that he

had the "requisite level of comprehension" to have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also Colorado v. Spring*, 479 U.S. 564, 573 (1987) (courts must consider the "totality of the circumstances" when analyzing knowing and intelligent prong); *United States v. Cristobal*, 293 F.3d 134, 142 (4th Cir. 2002) (explaining that a confession may be invalid where the defendant cannot "think rationally").

In making the final determination with regard to Hanna's statement to police, the district court concluded that its introduction into evidence at trial could not be considered harmless error. We agree. The only evidence produced by the state to rebut the insanity defense raised at trial was, preposterously, Hanna's supposed acquiescence in the police interrogators' reference to his having done something "wrong" or "bad." The prosecutor dwelled on this characterization of Hanna's remarks as evidence that he knew that it was legally wrong to shoot Tony Gillespie and, therefore, could not be considered legally insane under Michigan state law. As the magistrate judge noted, the proof introduced by the state in an effort to carry its burden of refuting the defense of insanity was so thin that the "Petitioner's inadmissible statement about his capacity to appreciate the wrongfulness of his conduct was essentially the only evidence [offered to support] the jury's finding of sanity." Without that evidence, the magistrate judge concluded, Hanna "was likely entitled to a directed verdict of acquittal . . . on the basis of his insanity defense." Under these

circumstances, introduction of an inadmissible statement cannot be said to constitute harmless error.

Turning to the question of prosecutorial misconduct, we endorse the analysis underlying the magistrate judge's determination that, taken together, the three instances raised on habeas entitle the petitioner to relief. Admittedly, the standard of review in this area of habeas jurisprudence is strict: in order to establish that prosecutorial misconduct is a basis for relief, the petitioner must demonstrate the conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process'." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). However, under the unique circumstances of this case – principally the fact that the state offered no evidence whatever concerning Hanna's mental condition at the time of the offense, despite ample proof from the defense to establish that he was completely delusional – we have little difficulty in concluding that the prosecutor's denigration of the insanity defense, standing alone, constituted a violation of due process.

In this circuit, we utilize a two-step process for determining whether a prosecutor's alleged misconduct violated a defendant's due process rights, looking first at whether the remarks were improper and then determining whether or not the impropriety was harmless. *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). The latter question is resolved under a four-factor test: (1) whether the conduct tended to mislead the jury or prejudice the defendant; (2) whether the conduct was isolated or extensive; (3) whether the conduct

was deliberate or accidental; and (4) whether the evidence against the defendant was strong. *See United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994) (citing *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976), *abrogated on other grounds, as recognized in United States v. Ellerbee*, 73 F.3d 105 (9th Cir. 1996)). Moreover, "[i]n assessing whether the error amounts to a constitutional deprivation, the court must view the totality of the circumstances." *Gall v. Parker*, 231 F.3d 265, 311 (6th Cir. 2000), *superceded by statute on other grounds, as recognized in Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003).

During the final phase of the state's closing argument to the jury, the prosecutor made the following comments:

> We do not want to create a ready avenue of escape for a person who does a dastardly deed and kills another human being via the reason of insanity because you enjoy some beliefs you think you have so therefore that puts me home free for whatever I do.
>
> The word we are really speaking about is responsibility. We all have to be responsible at one time or another for the course we choose to follow. Mr. Hanna elected to read the Bible, perhaps focus on the very controversial parts, as has been indicated, talking about Revelations, which was his understanding, not your understanding, perhaps. This is what makes it a controversial area. It is a controversial book in itself. This whole area is somewhat controversial. I don't think we can allow fixations of the mind to allow anyone to destroy another person and to be excused by reason of saying they're insane.

There was no objection to this argument at trial and, as the Michigan Court of Appeals pointed out, it is therefore the basis for reversing the jury's verdict only if it constitutes plain error resulting in manifest injustice to the defendant.[1]

In this case, we conclude that in making the comments quoted above, the prosecutor engaged in plain error on several grounds, resulting in an injustice that is certainly manifest and in clear violation of the Supreme Court's oft-cited principle that the right to due process guarantees a fair trial, one in which the prosecutor in a criminal case may strike hard blows but not foul ones. *See Berger v. United States*, 295 U.S. 78, 88-89 (1935). Within a span of only a few sentences, the state prosecutor at Hanna's trial managed to express his personal beliefs about the defendant's theory, to convey to the jury that the defendant would go free if found to be insane, to connect the insanity defense with the word "controversial" and, in general, to denigrate the insanity defense in a manner that invited the jury to engage in nullification, despite the fact that the state had offered no valid evidence in support of its burden to establish that Hanna was sane at the time he killed Gillespie. It is abundantly clear that in the absence of any actual evidence to rebut the proof of insanity offered by the defense, the prosecutor simply attacked the theory of insanity itself.

---

[1] Despite the respondent's contention that this claim has been procedurally defaulted, it appears that the state appellate court elected to decide the issue on its merits, which then provides us with a legitimate basis for review. Moreover, the failure to object to the argument at trial can only be ascribed to ineffective assistance of counsel, there being no basis on which to conclude that the omission was based on strategic choice – there simply is nothing strategic to be gained from having the state prosecutor make the kind of argument apparent from the transcript of the state trial.

Compounding the error, the Michigan Court of Appeals side-stepped the central

question by engaging in the following analysis:

> Where the issue at trial is the insanity defense, the question before the jury is that of the defendant's sanity or insanity at the time of the crime, not the possibility or even probability that an accused will in the future commit some other criminal act. Thus, inflammatory argument suggesting that a wrongdoer may go free and "to go out and shoot somebody else," warrants reversal even if there was no objection. However, although the remarks about which Hanna complains did suggest that Hanna hoped to escape responsibility for his conduct through the insanity defense, the prosecutor did not suggest that the jury should eschew that verdict in order that Hanna not be allowed to kill again. This is distinguishable from *People v. Lewis* [195 N.W.2d 30 (Mich. App. 1972)], in that *Lewis* involved extensive argument concerning the penal ramifications of the various verdicts. Here the prosecutor, at worst, only glanced off such an argument. Although a curative instruction could not have remedied the prejudice in *Lewis*, one in this case would have cured any prejudice stemming from the prosecutor's remarks.
>
> Further, the trial court did provide the customary instruction, "Possible penalty should not influence your decision," and we presume that juries follow their instructions. Such a result squares with respect for juries. Additionally, a trial court may cure improper civic-duty arguments when it instructs the jury that arguments of counsel are not evidence. Here, the trial court specifically so instructed the jury.

As the magistrate judge noted, this analysis is both factually and legally flawed

because it failed accurately to characterize both the content of the prosecutor's comment

and the nature of Hanna's claim. Instead of analyzing the issue in terms of an improper

denigration of a legally recognized defense, the state court recharacterized the claim as

one improperly suggesting that if not convicted, Hanna would be free to harm someone

else. The court then reviewed the record to determine whether the prosecutor's comments

in this regard had resulted in manifest injustice and concluded that, because the foul blow

was merely a "glancing" one, it did not implicate fundamental fairness. Calling this analysis a "straw-man argument," and pointing out that the state court did not discuss the claim actually made by Hanna, the magistrate judge held that the Michigan Court of Appeals had engaged in an unreasonable application of the due process principles set out in *Donnelly* and *Darden*.

We agree and, in doing so, point to our opinion in *Gall v. Parker*, in which we reviewed a similar attack on the insanity defense and reached the same conclusion as did the district court in this case, finding that under Supreme Court precedent in *Donnelly* and *Berger*, among other cases, the prosecutor's remarks in denigration of the insanity defense violated due process and warranted habeas relief, even in the absence of a contemporaneous objection. *See* 231 F.3d at 312-16. In *Gall*, the prosecutor used closing argument both to misrepresent the defendant's psychological evidence of insanity and to suggest that such evidence was unworthy of belief. We held that this line of argument "comprised part of a broader strategy of improperly attacking Gall's insanity defense by criticizing the very use of the defense itself, rather than addressing its evidentiary merits head on." *Id.* at 313. We recognized in that case that when the state is burdened with the necessity of establishing sanity in response to a defendant raising a defense of insanity, it is permitted vigorously to press its case, but we added:

> [B]ecause ours is a system of law, the arsenal available to a prosecutor to achieve that legitimate goal is limited to arguments rooted in properly introduced evidence and testimony rather than words and tactics designed

- 15 -

> to inflame passions, air unsubstantiated prosecutorial beliefs, and downplay the legitimacy of a legally recognized defense.

*Id.* at 316. The problem in this case, as in *Gall*, is the state court's failure to grapple with the actual due process violation apparent from the record and to analyze its effect on the fairness of the defendant's trial. Although the attack on the validity of Hanna's insanity defense was not as extensive as in Gall's case, we emphasize that it was particularly harmful in this case because of the state's failure to present *any* scientific evidence or relevant testimony to rebut the expert testimony introduced by the defense to establish insanity.

Thus, in finding that the violation of due process in this case could not be considered harmless, the magistrate judge carefully analyzed the four-part *Leon* test as follows:

> First, the remarks [in question] were likely to mislead the jury and were of the same kind as those described in *Gall*. The sole issue in the instant case was Petitioner's sanity at the time of the killing. In the context of the instant case, in which the prosecutor presented essentially no evidence to contradict the testimony of the four psychologists and psychiatrists who had examined Petitioner and found him to be insane, an attack on the defense itself was very likely to mislead the jury. Further, the remarks were made during rebuttal argument, at a time the defendant had no further opportunity to argue.

> Second, the remarks did not consist of an isolated comment. Instead, the prosecutor's statements involved two full paragraphs of argument during a relatively brief rebuttal. The prosecutor directly and flagrantly asked the jury to reject the law and not allow Petitioner to escape punishment because he is insane. While the comments were not as pervasive as those present in

*Gall*, they were more pointed, directly arguing what the comments in *Gall* merely implied.

* * * * *

Third, the remarks unquestionably were intentional. The prosecutor clearly and unequivocally told the jury that it should not allow "a ready avenue of escape for a person who does a dastardly deed and kills another human being via the reason of insanity because you enjoy some beliefs you think you have so therefore that puts me home free for whatever I do." This argument reflects the prosecutor's choice to disparage the very existence of the defense.

Finally, the evidence of Petitioner's sanity was virtually nonexistent, while the evidence of his insanity was substantial. In the context of the whole case, the remarks were of increased importance. As in *Gall*, because the prosecution failed to present an expert who had examined the defendant and assessed his sanity, the prosecution was limited to attacks on "[Petitioner]'s insanity defense compris[ing] largely 'foul blows' having little to do with cognizable facts or evidence." 231 F.3d at 311. (Remaining citations omitted.)

Based on this analysis, the magistrate judge concluded that the prosecutor's argument constituted a due process violation that deprived the petitioner of a fair trial. Moreover, he also determined that the failure of counsel to object to the argument rose to the level of ineffective assistance of counsel because the argument was so clearly improper that any "reasonable counsel" would have objected.[2] There was, the judge noted,

---

[2]Under Michigan case law, there is some question about whether an objection would even be required in this situation. As the Michigan Court of Appeals noted in a similar case, "The test for determining whether appellate review should occur despite a defendant's failure to object is whether the prejudice was so great that it could not have been corrected by a curative instruction even if a timely objection had been made." *People v. Wallace*, 408 N.W.2d 87, 90 (Mich. App. 1987). There, the prosecutor, attempting to avoid a not-guilty-by-reason-of-insanity verdict by disparaging the insanity defense in closing argument, said to the jury, "[W]e are seeing more and more of [insanity] as a defense, and more and more [defendants] are . . . getting off because of it." *Id.* The Michigan appellate court held in response, "This is a clear disparagement of the defense itself. This is not a case where the prosecutor is saying that the defense should not be applied for reasons unique to this case. Rather, the prosecutor is urging the jury not to apply the defense of insanity because the prosecutor does not like it. This is not only using the prestige of the prosecutor's office in support

no strategic reason to refrain from objection – if not during argument, then certainly at its

conclusion.   Finally, the magistrate judge held that counsel's failure resulted in actual

prejudice, thereby satisfying the standard of *Strickland v. Washington*,[3] because the record

reflected "a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different."  466 U.S. 668, 694 (1984).  We agree with

these conclusions.

This record calls for an additional observation pertinent to the possible retrial of this

case.  Although it has not been argued as a ground for relief in federal court, the state's

proof against Hanna appears to have failed to satisfy basic concepts of due process.  Our

review of state law indicates that Michigan's statutory definition of insanity permits a

defendant to establish insanity by alternative means, proving that he "lacks substantial

---

of its position but it is telling the jury to disregard the law simply because either the prosecutor or the jury might not approve of the defense of insanity.  Such disparagement of a defense allowed by law is not proper and constitutes error requiring reversal even if no objection is made." *Id.* at 90-1.  The court summed up its ruling by observing that "it is not permissible for a prosecutor to specifically invite a jury to compromise between a verdict of guilty and not guilty by reason of insanity by picking the middle ground of guilty but mentally ill . . . .  We recognize that in a particularly brutal case where the defendant admits perpetuating the acts and raises the defense of insanity, the temptation will be great to place the insanity defense on trial along with the defendant. However, it is not the function of the prosecutor to question the wisdom of the insanity defense once the Legislature has adopted it and defined it." *Id.* at 92.

[3]*Strickland* sets out a two-prong test for evaluating a claim of ineffective assistance of counsel.  To prevail, the petitioner must show both that defense counsel's performance was constitutionally defective because it fell below the range of objectively reasonable professional assistance, and  that counsel's deficient performance prejudiced his client, *i.e.,* that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668,  687, 688, 694 (1984).  According to the Supreme Court, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  We have held that "[b]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact," *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), rather than findings of historical facts that are subject to the presumption of correctness for state court factual findings mandated by section 2254(e)(1). *McGhee v. Yukins*, 229 F.3d 506, 513 (6th Cir. 2000).

capacity *either* to appreciate . . . the wrongfulness of his . . . conduct *or* to conform his . . . conduct to the requirements of law." M.C.L.A. 768.21a(1) (1994) (emphasis added). As we have already held in this case, the prosecutor relied upon nothing more than inadmissible evidence in an effort to establish that the petitioner "appreciated the wrongfulness of his conduct." Even more significantly, the prosecutor offered *no* evidence at all to rebut extensive testimony by defense witnesses that established Hanna's utter inability "to conform his conduct to the requirements of the law," thus meeting Michigan's statutory definition of insanity.

## **CONCLUSION**

For the reasons set out above, we AFFIRM the order of the district court granting the petitioner a conditional writ of habeas corpus and REMAND the case to the district court for issuance of the writ.