RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0301p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────

DARRYL GUMM,

> *Petitioner-Appellee,*

> No. 11-3363

*v.*

BETTY MITCHELL, Warden,

> *Respondent-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:98-cv-838—Walter H. Rice, District Judge.

Argued: November 20, 2013

Decided and Filed: December 22, 2014

Before: DAUGHTREY, MOORE and CLAY, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:** Seth P. Kestner, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Kathleen McGarry, MCGARRY LAW OFFICE, Glorieta, New Mexico, for Appellee. **ON BRIEF:** Seth P. Kestner, Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Kathleen McGarry, MCGARRY LAW OFFICE, Glorieta, New Mexico, Lawrence J. Greger, Dayton, Ohio, for Appellee.

CLAY, J., delivered the opinion of the court in which DAUGHTREY, J. joined, and MOORE, J. joined in all but Part II.B.4.c. of the majority's opinion and in the judgment. MOORE, J. (pp. 49–50), delivered a separate concurring opinion.

---

**OPINION**

---

CLAY, Circuit Judge.   Petitioner Darryl Gumm is mentally retarded and has an IQ of approximately 70.  He was convicted by an Ohio jury for the kidnapping, attempted rape, and murder of ten-year-old Aaron Raines.  For these crimes, Petitioner was sentenced to death.  His convictions and sentences were affirmed on direct appeal, and his state post-conviction petition was found to lack merit by the Ohio state courts.  After he filed a petition for federal habeas corpus, the United States Supreme Court decided in *Atkins v. Virginia*, 536 U.S. 304 (2002) that persons who are mentally retarded cannot be executed.  In Petitioner's post-*Atkins* petition for state post-conviction review, the Ohio courts adjudicated Petitioner mentally retarded and reduced his sentence to thirty years to life in prison.  In that second petition, the Ohio courts rejected Petitioner's non-*Atkins* claims.

On federal habeas review, the district court granted Petitioner a conditional writ of habeas corpus on the four claims we have before us on appeal.   These claims include (1) that the government failed to disclose exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 82 (1963); (2) that Petitioner received an unfair trial due to the improper admission of incendiary prior bad acts evidence; (3) that admission of a psychiatric report violated the Sixth Amendment's Confrontation Clause; and (4) that the prosecutor's elicitation of inflammatory testimony and admission of psychiatric reports constituted prosecutorial misconduct, causing a denial of due process.  Respondent Warden has appealed.  For the following reasons, this Court AFFIRMS the district court's grant of the conditional writ of habeas corpus based on Petitioner's *Brady* and prosecutorial misconduct claims.[1]

---

[1]Because we find that the district court properly granted habeas corpus relief on two of Petitioner's claims, we do not reach Petitioner's fair trial and Confrontation Clause claims.

# I.

# BACKGROUND

## A.    Factual Background

The facts of the crimes in this case are not disputed and have been summarized by the Ohio Supreme Court during its review of his convictions and sentences on direct appeal as follows:

> Early on the morning of May 12, 1992, the bludgeoned body of ten-year-old Aaron Raines was found by police in the basement of an abandoned building in the lower Price Hill section of Cincinnati. . . .
>
> At 11:00 p.m. on May 11, 1992, Aaron Raines's family reported Aaron as missing to Cincinnati police. An extensive neighborhood search took place, culminating in the discovery of Aaron's body in the basement of an abandoned building adjacent to a neighborhood park where Aaron had previously been playing.
>
> Several weeks later Betty Gumm, a friend of the Raines family and defendant's sister through adoption, learned that her brother Darryl had been in the neighborhood on the day of Aaron's murder. Betty knew that her brother was acquainted with Aaron, and was familiar with the abandoned buildings where Aaron's body was found, having stripped copper out of them many times at night. Betty called the local "crime Stoppers" number to report her information.
>
> On July 24, 1992, Cincinnati police interviewed appellant at his job site, a tobacco farm in Brooksville, Kentucky. At that time, Gumm told police he hadn't been in Cincinnati since March 1992, and indicated his desire to cooperate with police. On July 27, Cincinnati police returned to Brooksville to talk to Gumm again, and Gumm accompanied them back to Cincinnati, ostensibly to clear himself of any wrongdoing. After extensive questioning in which he changed his statement several times, Gumm eventually confessed involvement in the murder of Aaron Raines.
>
> Gumm's statement disclosed that he and one Michael Bies, a Kentucky acquaintance, were driven to Cincinnati on May 11 by acquaintances and dropped off around noon. Gumm told police that he and Bies went to a bar to drink beer, and later went to the Price Hill park adjacent to two abandoned buildings, where they encountered Aaron. Gumm and Bies were observed at approximately 7:00 p.m. sitting on a bench in the park in which Aaron last played. Gumm admitted that he lured Aaron into the abandoned building for sexual purposes by telling him he would be paid $10 to help strip copper from the buildings. According to Gumm, after the three entered the first building and crossed over a walkway into the second building, Bies asked Aaron to perform oral sex for money. When Aaron refused, Gumm claimed that Bies punched Aaron several times, picked

him up and carried him downstairs to the basement. According to Gumm, Bies there hit Aaron several additional times, once on the head with a "two by four." After that, Gumm stated that he and Bies fled the scene. Gumm claims that he himself did not hit Aaron at all, but conceded that he might have stepped on his body as he was attempting to flee from the basement.

When police found Aaron's body at the crime scene, they noticed several objects around the body that contained blood and hairs consistent with the victim's. These objects included a chunk of concrete, a pipe, pieces of wood, and twine found wrapped around Aaron's neck.

Amy Martin, M.D., a former deputy coroner of Hamilton County, examined Aaron's body at the crime scene and conducted the post-mortem exam at the coroner's office. Dr. Martin testified that Aaron sustained twenty-one lacerations to the back of his head, representing twenty-one separate blows from an object, and that some of these wounds manifested lines that matched the threading on the pipe found next to the body. Five of Aaron's ribs were broken, which Dr. Martin found unusual for a boy of his age, since such bones are usually flexible. Dr. Martin opined that "something like a kicking or stomping" would be the type of force necessary to break a young boy's ribs. Dr. Martin further testified that the left side of Aaron's face was completely crushed in a manner consistent with a blow from the chunk of concrete found lying next to the body. Several "chevron pattern" bruises consistent with the tread of a Nike gym shoe were found on several areas of Aaron's body. Gumm had told police that he thought Bies had been wearing L.A. Gear gym shoes, and acknowledged that he had thrown his own shoes away.

Dr. Martin testified that Aaron also sustained a broken jaw, chipped teeth and cut lips, a deep laceration and bone chip on the underside of his jaw, compression wounds and hemorrhages in the eyes probably caused by compression of twine wrapped around his neck, and pattern bruises typical of injuries caused by being struck with a stick or rod.

Dr. Martin found no evidence of any defensive wounds on Aaron's body, and opined that the absence of defensive wounds was consistent with Aaron having been held or restrained while his injuries were being inflicted. Dr. Martin determined that the cause of death was a combination of blunt impacts to the head, chest and abdomen, as well as blunt injury to the neck.

*State v. Gumm*, 653 N.E.2d 253, 257-58 (Ohio 1995); *see also State v. Bies*, 658 N.E.2d 754, 756-57 (Ohio 1996) (discussing facts of the crime in the context of co-defendant Bies' appeal).

## B. Procedural History

Petitioner was indicted on the following counts: (1) aggravated murder with death penalty specifications, in violation of Ohio Revised Code § 2929.04(A)(3) (offense committed to escape

detection, apprehension, or punishment for another offense) and Ohio Revised Code § 2929.04(A)(7) (murder committed while offender committed or attempted to commit kidnapping and rape); (2) attempted rape, in violation of Ohio Revised Code § 2923.02; and (3) kidnapping, in violation of Ohio Revised Code § 2905.01. A jury convicted Petitioner on all counts.

Petitioner did not testify during the mitigation phase of his trial and called only one witness—his sister, Karen Ridenour. The jury recommended imposition of the death penalty after concluding beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors. The trial court imposed the death sentence for the aggravated murder count and imposed consecutive terms of imprisonment for Petitioner's attempted rape and kidnapping convictions. *State v. Gumm*, 653 N.E.2d 253, 258 (Ohio 1995).

Petitioner's convictions and sentence were affirmed by the Ohio Court of Appeals, *see State v. Gumm*, Nos. C-020907, B-925608, 1994 WL 44411 (Ohio Ct. App. Feb. 16, 1994), and by the Ohio Supreme Court, *see Gumm*, 653 N.E.2d, *cert. denied*, 516 U.S. 1177 (1996).

### 1.      Trial

A number of issues on appeal concern evidence adduced during Petitioner's trial. Specifically, Petitioner raises claims relating to the testimony of Phyllis Thacker and Charlotte Jean Baker, as well as psychiatric reports admitted during the testimony of Petitioner's expert, Dr. Henry Leland.

Following opening statements by each side, the prosecutor put on Thacker, whom Petitioner had lived with on and off for a number of years. After establishing how Petitioner came to live with Thacker, the prosecutor began questioning Thacker about Petitioner's "problem with alcohol." (J.A. at 247.) This line of questioning drew an objection from Petitioner's counsel, but the objection was overruled. Thacker then testified about Petitioner's "hateful" nature when he was drunk, explaining that he would "quarrel[] and smart[] off to people." (*Id*. at 248.)

The prosecutor continued to press the issue and eventually focused his attention on a situation that occurred sometime in January 1992—five months before the murder. Again,

Petitioner's counsel objected, stating that the events of January 1992 had "nothing to do with the event that supposedly occurred on May the 11ᵗʰ of '92, and it's really not relevant." (*Id.* at 250.) The prosecutor responded that the testimony from Thacker was "part of the background leading up to the homicide." (*Id.*) The trial court overruled the objection and allowed the questioning to continue. The following exchange ensued:

> Q. Mrs. Thacker, I think we were at the point where I asked you why you became afraid of Junior and why you wanted him out of your house. Was there anything specific that evening?
>
> A. Junior's personality changed. He talked crazy talk and he – he acted strange to me and he said things that made me afraid to be there with him, just me and my daughter by myself.
>
> Q. What did he say to you that made you afraid?
>
> A. Once he told us – we have a horse. Once he told us that the horse told him that he was mad at – that she was mad at him because he was mistreating him, and he was crying and he was serious that that horse had actually talked to him and told him that.
>
> Q. Did he tell you why the horse was mad at him?
>
> A. She said he wasn't taking care of him, that he was mistreating him and that the horse told him that he didn't love him anymore.
>
> Q. Anything more specific than that? Do you remember what you told me? . . . Did he tell you one time something he had done with the horse?
>
> A. (No response.)
>
> Q. Is that difficult for you to tell us?
>
> A. Yes.
>
> Q. You're going to have to.
>
> [Petitioner's counsel]: I'm going to object to the form of the question. He's leading the witness.
>
> THE COURT: Overruled. Go on. You can tell us. Can you answer?
>
> A. I can't say that. He told us that he did it to the horse and the horse got mad at him.
>
> Q. He did it to the horse?
>
> A. (Indicate yes.)
>
> Q. Is that the word he used or did he use a different word?

A.      He used the other word.

Q.      You can use the other word.

A.      I can say the letter to the other word.

Q.      Can you spell it?

A.      That's still cussing.  F – he said he fucked the horse.

(*Id*. at 251-53.)  After obtaining this answer about bestiality, the prosecutor moved on to another topic.

Thacker's testimony was not limited to the initial presentation.  The prosecutor used the inflammatory information in the rebuttal closing arguments to the jury:

> Sex is the motive in this particular case, and it fits the profile. . . .  Darryl likes to shoot pool, and he likes to have sex.  It's probably a strange hobby, but it fits.  Sex is a hobby, and he likes to have it every day: Sex with a woman; sex with a man, which he's had on fifteen to twenty occasions according to the evidence; *sex with animals, according to Phyllis Thacker*; and sex with little boys.

(*Id*. at 315 (emphasis added).)

The prosecutor used the second witness in the case, Charlotte Baker, to show that at the time of the murder, Petitioner was "desperate for a woman . . . to have sex.  And he wanted to do it with anyone."  (*Id*. at 260 (during a sidebar).)  Petitioner's counsel objected, stating, "[I]t's prior acts, and when you get to prior acts, you're going into some very dangerous evidentiary grounds," but the trial court overruled the objection.  (*Id*.)  The prosecutor asked Baker questions as follows:

Q.      [D]o you remember the conversations that you had with Junior back in April or May of '92?

A.      Yes.  Just mostly the same thing about he was, you know, coming back to his girlfriend.

Q.      Okay.  What specifically did he say with regard to how he was feeling about having sex?

A.      . . . He said that he was going to go home and – he was going to go home and get him some pussy and that he was going to fuck her until they both was sore. . . .

Q.      Did he say anything about being hard up for a woman?

A.      Well, he didn't say it.  You could see it. . . . towards the way he looked at any woman at all.

Q.      Did he ever say that he's so hard up he'd do it to anyone?

[Petitioner's counsel]:          Now there's an objection to that, Judge.

THE COURT:          Overruled, if you can remember.

A.      No.

(*Id*. at 261-63.)  Once again, after obtaining this inflammatory testimony and injecting his own language, the prosecutor moved on.

The final episode of Petitioner's trial that is relevant for this appeal concerned the testimony of Petitioner's sole witness: psychiatrist Dr. Leland, who opined that Petitioner evinced "a mild to borderline level of mental retardation" as well as a difficulty "synthesiz[ing] external stimuli." (*Id*. at 281.)  This condition would cause Petitioner to "confuse what he had witnessed or experienced with what had been told to him," (*id*. at 284), which, Dr. Leland explained, made Petitioner's statements to the police unreliable.  Dr. Leland's opinions were based, in part, on court-compiled psychiatric reports.

At the close of Dr. Leland's testimony, the prosecutor moved to strike the entirety of his testimony unless the psychiatric reports were admitted into evidence.  Petitioner's counsel objected to this based on hearsay.  However, Petitioner's counsel later stated that he had no objection to admission of the reports "[e]xcept for whatever hearsay, prejudicial material the Court is permitting the jury to hear which is not from witnesses who appeared in this case." (*Id*. at 299.)  Petitioner's counsel did not press his objection further because he did not want Dr. Leland's testimony stricken from the record.

The psychiatric reports contained bizarre statements and allegations, which were summarized by the magistrate judge as follows:

> [I]n her statement respecting her interview of Charles Bray, social worker Marilyn Geeding states that "Charles recalls hearing a story from his wife of an incident where [Petitioner] threw a raccoon into a 5-gallon bucket of paint." . . . Similarly, Geeding notes that Bray related [Petitioner]'s having tried to persuade a relative to "suck him," but that Bray did not know the date of the incident because it "was never reported to him, simply the behavior." . . . Betty Gumm, Petitioner's sister . . . "had a report that Darryl had crawled into bed with some woman and

her husband who lived in the apartment across the street from Betty." . . . Betty also described to Geeding an incident in which [Petitioner] threw a dog into a space heater, killing it, and another in which [Petitioner] was barred from a relative's house because he had stolen from the relative. . . . Betty Gumm[] report[ed] that [Petitioner] had tried to rape a friend of hers. Both Charles Bray and Betty Gumm stated that [Petitioner] was frequently cruel to animals. Bray reported that [Petitioner] would kick dogs and had planned to kick a neighbor's dog to death before he was stopped . . . . Betty Gumm told Geeding that [Petitioner] had once heated a spoon on the stove, then pressed it against a nephew's arm, which left a permanent scar on the boy.

*Gumm v. Mitchell*, No. 1:98–cv–838, 2009 WL 7785750, *37-38 (S.D. Ohio Sept. 28, 2009) (citations omitted).

Like Thacker's testimony, the prosecutor used this evidence in the closing argument to the jury as follows:

Charles recalls hearing a story from his wife of an incident where [Petitioner] threw a raccoon into a five-gallon bucket of paint. Charles admits that [Petitioner] was cruel to animals and would frequently kick them. On one occasion he recalls [Petitioner] planning to kick the neighbor's dog to death before he was stopped by the dog's owner. Begin to fit the personality?

After this offense occurred, he did report an incident where [Petitioner] attempted to get one of their nephews to suck him. Begin to fit the pattern? These are from people who are not police officers, not prosecutors. They're people, if anything, who should be in the defense. They interviewed Betty Gumm. You heard what she said. . . . Betty recalls [Petitioner] tried to rape a friend of hers; however, there was not enough evidence on this occasion to convict him. He was described as rowdy, arguing, and fighting when he was drunk. Does that fit the pattern? Betty recalls[Petitioner] as always being cruel to animals.

On one occasion, [she] recalls [Petitioner] throwing her sister Karen's daughter's dog into a space heater and the dog dying. On another occasion, Betty recalls [Petitioner] putting a spoon on the stove until it got hot and then putting it on their nephew's arm.

(J.A. at 308-09.)

## 2.    State Court Post-Conviction and Federal Habeas Proceedings

On September 16, 1996, Petitioner filed a petition for state post-conviction relief. *State v. Gumm*, No. C-960972, 1997 WL 752608, at *1 (Ohio Ct. App. Dec. 5, 1997). The common pleas court found that all of Petitioner's grounds for relief were barred by Ohio's res judicata

rule, which "provides in relevant part that a final judgment of conviction bars a convicted defendant from raising in any proceeding, except an appeal from that judgment, any issue that was raised, or could have been raised, at trial or on appeal from that judgment." *Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir. 2004) (citing *State v. Perry*, 226 N.E.2d 104, 105-06 (1967)). The court of appeals affirmed. *Gumm*, 1997 WL 752608, at *2-3. The Ohio Supreme Court refused to hear an appeal. *State v. Gumm*, 691 N.E.2d 1057 (Ohio 1998) (table decision), *cert. denied*, 525 U.S. 884.

Following his defeats in state court, Petitioner filed his federal petition for a writ of habeas corpus on November 6, 1998. That petition was amended on October 20, 2000, and again on April 20, 2001. While his federal petition was pending, the Supreme Court, on June 20, 2002, held that the execution of mentally retarded criminals violates the Eighth Amendment's prohibition against cruel and unusual punishments. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). Based on that decision, Petitioner moved to stay his federal habeas proceedings to allow him to return to state court to litigate the issue of his mental capacity. That motion was granted, and on April 7, 2003, Petitioner filed a petition in Ohio state court seeking the resolution of his *Atkins* claim. *State v. Gumm*, 864 N.E.2d 133, 135 (Ohio Ct. App. 2006).

The state trial court, using the standards set forth in *State v. Lott*, 779 N.E.2d 1011 (Ohio 2002), adjudged Petitioner mentally retarded, *Gumm*, 864 N.E.2d at 135, and reduced his sentence to life imprisonment with the possibility of parole after thirty years on the aggravated murder count, eight to fifteen years' imprisonment on the attempted rape count, and ten to twenty-five years' imprisonment on the kidnapping count, *Gumm v. Mitchell*, No. 1:98-CV-838, 2009 WL 7785750, at *4 (S.D. Ohio Sept. 28, 2009). In addition to his *Atkins* claim, Petitioner also presented "claims seeking relief from his conviction on an array of non-*Atkins* grounds," all of which were denied by the trial court.[2] *Gumm*, 864 N.E.2d at 135. The Ohio Court of Appeals affirmed the trial court's determination that Petitioner was mentally retarded, *id*. at 136-40, as well as the trial court's dismissal of Petitioner's non-*Atkins* claims based on Ohio Revised Code

---

[2]While litigating his *Atkins* post-conviction petition, Petitioner also submitted an application to reopen his state court direct appeal. This was denied by the court of appeals on January 16, 2004. The Ohio Supreme Court affirmed that decision and denied Petitioner's motion for reconsideration. *Gumm*, 2009 WL 7785750, at *4.

§ 2953.23, *see id*. at 140-42. Further appeal to the Ohio Supreme Court was denied. *State* v. *Gumm*, 867 N.E.2d 884 (Ohio 2007) (table decision).

After his return to state courts, Petitioner's federal habeas claim was reopened, and Petitioner amended his petition for a third time on September 13, 2007. The petition was referred to a magistrate judge, who recommended granting Petitioner a conditional writ on his fair trial, Confrontation Clause, and prosecutorial misconduct claims, but not on his claim under *Brady v. Maryland*, 373 U.S. 83 (1963). *Gumm*, 2009 WL 7785750.

On the *Brady* claim, the magistrate judge concluded that the Ohio Court of Appeals' decision was not entitled to AEDPA deference because it was based on that court's lack of jurisdiction to entertain the claim under Ohio Revised Code § 2953.23(A)(1)(b). *Id*. at *18-19. On *de novo* review, however, the magistrate judge recommended not granting habeas relief because "[m]uch of the alleged *Brady* material is nothing more than rumor, hearsay, hearsay upon hearsay, hearsay upon hearsay upon hearsay, or worse. Gumm has not explained how any of that 'evidence' would have been rendered admissible in court, or how it would have led to admissible evidence." *Id*. at *25; *see id*. at *20-27.

Applying AEDPA deference to Petitioner's fair trial claim, the magistrate judge found that "the damaging testimony was elicited from the prosecutor's first witness, tainting the trial from the outset. The ["fucked a horse"] testimony was irrelevant to the offenses charged, highly inflammatory, of exceedingly questionable veracity, and not counterbalanced by a limiting instruction or overwhelming evidence of Gumm's guilt to render its admission harmless." *Id*. at *28-34. The magistrate judge stated that Thacker's testimony was "among the most outrageously inflammatory evidence th[e] Court has ever read in a capital case transcript," *id*. at *30, and concluded that the Ohio Supreme Court's denial of his claim was both "contrary to federal law[] and was based on . . . an unreasonable determination of the facts," *id*. at *34.

Construing Petitioner's claim regarding the admission of the psychiatric reports as one under the Confrontation Clause, the magistrate judge reviewed this claim *de novo* because "[a]lthough Gumm did not present this part of his claim to the state supreme court, Respondent does not advance a procedural default defense." *Id*. at *34-35. The magistrate then found that, under *Ohio v. Roberts*, 448 U.S. 56 (1980), the prosecutor failed to demonstrate either

unavailability of the witnesses or indicia of reliability, and recommended granting habeas on this claim.

Finally, with respect to Petitioner's prosecutorial misconduct claim, the magistrate judge found that the only preserved portion of this claim regarded the "prosecutor's elicitation of the other acts evidence"—that is, the evidence of bestiality and Petitioner's sexual drive and the claims made in the psychiatric reports. *Id*. at *39-40. The magistrate judge found that the prosecutor had deliberately elicited the testimony about bestiality without adequately informing the trial court about the specifics of what he intended to bring out. *See id*. at *42. The magistrate judge found similarly as to the introduction of the hearsay in the psychiatric reports and further, the prosecutor "argued [it] as truth . . . in its closing argument." *Id*. at *43. In sum, the magistrate judge held, "the Court concludes that the prosecutors in Gumm's trial did engage in misconduct to the substantial prejudice of the defense. The state supreme court's conclusion [to the contrary] . . . is objectively unreasonable when evaluated under the governing federal law as articulated by the United States Supreme Court." *Id*. Therefore, the magistrate judge recommended granting habeas on Petitioner's prosecutorial misconduct claim as well.

The district court reviewed the report and recommendation and adopted it with respect to Petitioner's fair trial, Confrontation Clause, and prosecutorial misconduct claims but rejected it with respect to Petitioner's *Brady* claim. *Gumm v. Mitchell*, No. 1:98-CV-838, 2011 WL 1237572, at *1 (S.D. Ohio Mar. 29, 2011). On the claims that the magistrate judge recommended granting relief, the district court essentially adopted the magistrate judge's reasoning *in toto*. *See id.* at *10-12. The district court disagreed with the magistrate judge's assessment of the *Brady* claim. Whereas the magistrate judge had found that the *Brady* claim failed because most of the evidence complained of was inadmissible, the district court noted that "does not necessarily mean that it would not lead to admissible evidence or that it was not subject to disclosure." *Id*. at *6. The district court was particularly bothered by the prosecutor's "failure to turn over tips, interview notes and other evidence concerning suspect Roger Cordray," which it believed could have led to reasonable doubt (especially given the prosecutor's "not very strong" case). *See id*. at *7-8. The district court therefore granted Petitioner habeas relief on his *Brady* claim as well.

## II.

## DISCUSSION

**A.     Standard and Scope of Review**

On appeal of a denial or grant of a petition for a writ of habeas corpus, this Court reviews the district court's conclusions of law *de novo* and its factual findings for clear error. *Hanna v. Ishee*, 694 F.3d 596, 605 (6th Cir 2012). Such review is, however, subject to the standards set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996). *Id*. "[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas retrials and to ensure that state-court convictions are given effect to the extent possible under the law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (internal quotation marks omitted). Under 28 U.S.C. § 2254(d), a petitioner may not obtain federal habeas corpus relief with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court's decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). An unreasonable application of clearly established law occurs when "the state court identified the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 134 S. Ct. 1697, 1706-07 (2014). In a case where "a habeas court must extend a rationale before it can apply to the facts at hand, [] by definition the rationale

was not clearly established at the time of the state-court decision." *Id*. at 1706 (internal quotation marks omitted).

The Supreme Court has explained that "[f]or purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (internal quotation marks omitted). Further, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id*. at 786 (internal quotation marks omitted). Lastly, "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id*. (internal quotation marks omitted). This deference reflects the view that § 2254 is only to be used to "guard against extreme malfunctions in the state criminal justice systems." *Id*. (internal quotation marks omitted).

If, however, a claim was not "adjudicated on the merits in State court proceedings," pursuant to § 2254(d), then this Court applies pre-AEDPA standards and reviews any legal issue *de novo*. *See Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013) ("The language of 28 U.S.C. § 2254(d) makes it clear that this provision applies only when a federal claim was adjudicated *on the merits* in State court."); *Robinson v. Howes*, 663 F.3d 819, 822-23 (6th Cir. 2011).

**B.      Petitioner's *Brady* Claim**

Petitioner asserts that the state prosecutor failed to honor its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963) to disclose information favorable to Petitioner during his trial. Specifically, Petitioner claims that "[t]he State failed to disclose more than [170] pages of evidence that detailed their investigation into the death of Aaron Raines." (Pet'r's Br. at 8.)

Petitioner's *Brady* claim was presented to the Ohio Court of Appeals during his post-*Atkins* petition for post-conviction review. That court addressed the *Brady* claim as follows:

> In his fifth claim, Gumm sought relief from his conviction on the ground that the state had failed to disclose exculpatory evidence in the form of information developed by the police during their investigation. . . .

. . .

> In support of his fifth claim, Gumm offered Crimestopper reports, lead and tip sheets, and investigation notes and summaries memorializing information received and gathered by the police during their investigation.  These records showed what the investigating officers had stated at Gumm's trial: that the police had initially had few leads and had cast a very wide net to find the killer.  The officers inquired about sex offenders known to live in or frequent the neighborhood surrounding the abandoned building where the victim had been found.  They followed tips, often based on rumor and second- and third-hand information, concerning individuals who had made incriminating statements or had exhibited suspicious behavior, individuals who had been seen in or around the abandoned building or the surrounding neighborhood, and individuals who had been seen with the victim around the time of the murder.  They also obtained information that impeached the victim's brother's [Dallas Haynes] credibility and contradicted the state's theory concerning when the murder had occurred.

> From our review of the record, we conclude that the undisclosed evidence, viewed collectively, was not "material" in that it could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict[s]."[3] Therefore, the state's failure to disclose the evidence did not deny Gumm his constitutional right to a fair trial.[4]  Moreover, the record will not permit the conclusion that, but for the state's failure to disclose the evidence, no reasonable factfinder would have found him guilty of the offenses of which he was convicted.  Thus, Gumm failed to satisfy the [Ohio Revised Code §] 2953.23 jurisdictional requirement of outcome-determinative constitutional error.  We therefore hold that the common pleas court properly declined to entertain his fifth postconviction claim.[5]

*Gumm*, 864 N.E.2d at 133 (footnotes in original).  While the Ohio Court of Appeals cited relevant *Brady* case law and seems to have made a pronouncement on the merits of Petitioner's claim, the court ultimately held that it was without jurisdiction to "entertain" Petitioner's *Brady* claim because Petitioner failed to meet the requirements of Ohio Revised Code § 2953.23(A).

After reviewing this decision and relevant Ohio case law, the magistrate judge found that § 2953.23(A) requires "that petitioners demonstrate outcome-determinative constitutional error by clear and convincing evidence as a prerequisite to the courts' subject matter jurisdiction."

---

[3]"*See Kyles v. Whitley*, 514 U.S. [419,] 435 [(1995)]."

[4]"*See Brady v. Maryland*, 373 U.S. [83,] 87 [(1963)]."

[5]"*See* [Ohio Rev. Code §] 2953.23(A)(1)(b)."

*Gumm*, 2009 WL 7785750, at \*18 (collecting cases).  The magistrate judge went on: "Taken to its logical conclusion, that interpretation leaves the state courts with jurisdiction only over winning claims." *Id*.  The magistrate judge concluded that because the Ohio Court of Appeals found that it lacked subject matter jurisdiction, and because "a judgment rendered by a court lacking subject matter jurisdiction is void ab initio," *id*. (quoting *Patton v. Diemer*, 518 N.E.2d 941, 944 (Ohio 1988)), the court of appeals' conclusions on the merits of Petitioner's *Brady* claim were not entitled to AEDPA deference. The magistrate judge applied *de novo* review to Petitioner's *Brady* claim, and the district court adopted that analysis.

## 1.    Standard of Review

Although the Ohio Court of appeals conducted a brief *Brady* analysis, it went on to conclude that it did not have jurisdiction to entertain Petitioner's second petition for post-conviction relief.  *See Gumm*, 864 N.E.2d at 133.  *De novo* review is appropriate in this case because the state court did not adjudicate this claim on the merits and did not address the issue in an opinion in which the court had jurisdiction over the matter.[6]  This Court and others have held that where a state court decides a petitioner's claim on alternative grounds, one on the merits and the other on a procedural bar ruling, a federal habeas court may still review that court's merits analysis and apply AEDPA deference to that adjudication.  *See Brooks v. Bagley*, 513 F.3d 618, 624 (6th Cir. 2008); *Hoffner v. Bradshaw*, 622 F.3d 487, 505 (6th Cir. 2010), *cert denied*, 131 S. Ct. 2117 (2011); *Busby v. Dretke*, 359 F.3d 708, 721 n. 14 (5th Cir. 2004), *cert denied* 541 U.S. 1087 (2004); *Johnson v. McKune*, 288 F.3d 1187, 1192 (10th Cir. 2002), *cert denied*, 537 U.S. 1050 (2002).   However, this case is not such a case.   Instead, the Ohio courts have clearly indicated that § 2953.23 denies courts subject matter jurisdiction over claims that cannot meet the statute's stringent requirements.  The Ohio courts have interpreted their own law to conclude that where a court lacks jurisdiction, any judgment on the merits is rendered void ab initio.  This Court should not reinterpret an issue of state law that has already been interpreted by the state courts.  *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (explaining that "it is not the province of

---

[6]It does not appear that the warden appeals the magistrate judge and district judge's application of *de novo* review or the conclusion that the claim is not procedurally defaulted.

a federal habeas court to reexamine state-court determinations on state-law questions."). Therefore, we apply *de novo* review to Petitioner's *Brady* claim.

Relief on Petitioner's *Brady* claim is warranted because there was an unquestionable and egregious *Brady* violation in this case.

### 2. Clearly Established Law

The goal of the criminal justice system, as set forth in *Brady* and its progeny "is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair." *Brady*, 373 U.S. at 87. To achieve this goal, "*Brady* held 'that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (quoting *Brady*, 373 U.S. at 87). Because a *Brady* duty is triggered even if the "evidence [is] 'known only to police investigators and not to the prosecutor,'" compliance with *Brady* imposes a duty on the prosecutor "'to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999) (quoting *Kyles*, 514 U.S. at 437-38). In sum, "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (internal quotation marks omitted). Or, put another way, "[t]here are three components of a true *Brady* violation: [(1) t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [(2)] that evidence must have been suppressed by the State, either willfully or inadvertently; and [(3)] prejudice must have ensued." *Strickler*, 527 U.S. 281-82.

Taken together, the materiality and prejudice prongs do not require a defendant to show that disclosure of the evidence would have ultimately led to an acquittal. Instead, the defendant must establish only that in the absence of the evidence he did not receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. If the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict," then a *Brady* violation has occurred.  *See id*. at 435.  *See also Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (internal quotation marks omitted) ("[E]vidence is material within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.").  "A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine[] confidence in the outcome of the trial." *Id*. at 630 (internal quotation marks omitted).

Significantly for this case, withheld information is material under *Brady* only if it would have been admissible at trial or would have led directly to admissible evidence.  *United States v. Ogden*, 685 F.3d 600, 605 (6th Cir. 2012).  "[Inadmissible] information 'is not evidence at all' for purposes of *Brady* and thus can have no 'direct effect on the outcome of a trial.'" *Wogenstahl v. Mitchell*, 668 F.3d 307, 325 n.3 (6th Cir. 2012) (quoting *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995)).  A federal habeas court's conclusion that undisclosed inadmissible evidence would lead directly to admissible evidence may not be based "on mere speculation." *Wood*, 516 U.S. at 6.

Importantly, when viewing the undisclosed evidence, courts are to focus on the cumulative effect of the undisclosed evidence on the jury's verdict.  *See Kyles*, 514 U.S. at 436-37 (holding that undisclosed evidence should be "considered collectively, not item by item").

### 3.       Evidence Withheld

Petitioner identifies several categories of evidence that the state failed to turn over prior to his trial.  This includes evidence regarding other suspects, some of whom confessed to having committed the crime, evidence regarding the prosecutor's implied timeline of the crime, and impeachment evidence.

### a.       Other Suspects

The state failed to disclose a substantial collection of tips, leads, and witness statements relating to other individuals who had been investigated for the murder of Aaron Raines.  On its face, the nondisclosure of the identities of these suspects—two of whom were reported to have

confessed to the murder—is an egregious breach of the state's *Brady* obligations.  *See D'Ambrosio v. Bagley*, 527 F.3d 489, 498-99 (6th Cir. 2008); *Jamison v. Collins*, 291 F.3d 380, 390-91 (6th Cir. 2002).  Prosecutors are not necessarily required to disclose every stray lead and anonymous tip, but they must disclose the existence of "legitimate suspect[s]," *D'Ambrosio*, 527 F.3d at 499, especially when such information has been specifically requested by the defendant, as it was in this case.  "Withholding knowledge of a second suspect conflicts with the Supreme  Court's directive that 'the criminal trial, as distinct from the prosecutor's private deliberations, [be preserved] as the chosen forum for ascertaining the truth about criminal accusations.'"  *United States v. Jernigan*, 492 F.3d 1050, 1056-57 (9th Cir. 2007) (en banc) (quoting *Kyles*, 514 U.S. at 440).

### i.        Roger Cordray

Police investigators amassed a number of reports that Cordray had confessed to the murder of Aaron Raines, and witnesses told police that Cordray was known to sleep in the abandoned building where Aaron's body was found.  One witness, George Putteet, told police that he had seen Aaron in the vicinity of the abandoned building around 10:30 p.m. on the night of the murder.  Putteet further stated that a group of unidentified individuals "were messing with drunks in the alley," including Cordray, and were "calling him names & getting him to chase them."  (J.A. at 55.)  Although many of the witnesses' statements were second-hand, it was widely believed that Cordray had admitted to numerous people that he was guilty of the crime, and indeed that he had bragged about it and was "glad Aaron was dead."  One witness reported that another man "beat up" Cordray after he said that he and a friend had killed Aaron.  Cordray allegedly threatened a woman named Christine Robertson that he would harm her if she told anyone about a coat belonging to him that was discovered in the abandoned building.

Anthony Steele and Theresa Wright-Steele told police that Cordray had approached them and said, "I did it.  I killed the little kid."  (*Id*. at 39.) They further reported that Cordray's hands and knuckles were "all scraped up," and although Cordray was drunk and high on Valium at the time, they believed him when he confessed to killing Aaron.  (*Id*.)  Police investigated Cordray further, but they could not match his shoes to the footprints found at the crime scene.  There were "some similarities" between the ridge pattern of Cordray's palm print and the prints found at the

scene, but the police were unable to make a positive identification. (*Id*. at 41.) Cordray denied any involvement in Aaron's murder when speaking with the police, and there was no further investigation because the investigating officer drafting the report thought Cordray was being truthful.

The magistrate judge described the overwhelming evidence pertaining to Cordray as follows:

> The "Crime-Stoppers" tips include information that an individual by the name of Roger was known to sleep in the building where Aaron's body was found. Roger also frequently drank in the building next door. Another tip came from Barb Desborough, who indicated that Roger Cordray confessed to the murder. Desborough also informed police that Vivian Stimetz might know who heard Roger confess, but the tip sheet stated that Vivian had not been located as of May 18, 1992. Barb Desborough reported hearing from people who attended Aaron's funeral that Roger Cordray was bragging that he had killed Aaron, and that he was glad Aaron was dead. The police eventually found Vivian Stimetz, who was Aaron's aunt, and interviewed her. She stated that Betty Gumm, Petitioner's sister, communicated a rumor to Stimetz that Cordray was bragging about how he had beaten Aaron. Stimetz also repeated the rumor that Cordray lived in the abandoned building where Aaron's body was found, but stated that she had never seen him anywhere but on the street. There is a reference to Cordray's having been taken away by the paramedics after he said this, but the context of that comment is unclear.
>
> The police also interviewed Christine Robertson, who said that supposedly there was a coat belonging to Cordray found in the building where Aaron's body was discovered. Robertson stated that she had been threatened by Cordray not to say anything about the coat or he would harm her. Anthony Steele told the police that Roger Cordray had confessed to him that he had killed the little kid. Steele noticed that Cordray's hands and knuckles were scraped up, too. Steele also stated that Cordray had confided to him that Cordray was a suspect in the murder, but that he could never do that because he loves kids.
>
> In an investigative summary, a police officer described a meeting with Anthony and Theresa Steele, who stated they were near the murder scene with Cordray on an unspecified date when Cordray told them he had killed the little kid. Although both Anthony and Theresa were under the influence of drugs or alcohol at the time, both believed Cordray was being honest with them. The officers returned to the Steele home to talk with Anthony and Theresa again. The Steeles repeated their story with somewhat more detail during the second conversation.
>
> The officers eventually located Cordray and took pictures of his shoes and fingerprinted him. Cordray described his activities on the night of the murder and denied knowing Aaron Raines or seeing him the night of the murder, and stated

he would never do anything to hurt a child. In addition, the tread on Cordray's shoes did not match from the crime scene. A comparison of Cordray's palm print to one found at the scene revealed similarities, but no points upon which an identification of the found print as Cordray's might be made. The author of the investigative summary expressed his belief that Cordray was being truthful, and skepticism that Cordray was involved in Aaron's murder.

In notes from an interview of Betty Gumm, Petitioner's sister, it stated that Donna Jones heard Roger Cordray state that he killed Aaron. There is also a note indicating that Paul Worthington heard Cordray "bragging to the cops + priest that he had done the killing." Talk around the neighborhood was that Cordray had committed the murder. Another investigative summary basically repeats the information gathered from Barb Desborough. A conversation with Roberta Shinkle indicated that William O'Malley beat Cordray because Cordray said he and a friend had killed Aaron. One story that traveled through several people before reaching the police involved Rick Baker's desire to have a pair of very bloody jeans washed. Baker explained the blood on his jeans by stating that after Cordray was beaten, he helped Cordray, getting Cordray's blood on his jeans in the process. An unidentified individual stated that he or she saw Aaron the night he was murdered, and that he or she saw Cordray with two other men sitting on some steps in the vicinity that same night.

*Gumm v. Mitchell*, No. 1:98–cv–838, 2009 WL 7785750, at *20-21 (S.D. Ohio Sept. 28, 2009).

### ii.      Raymond Moore

Police received numerous reports potentially implicating Raymond Moore, who had apparently previously lived in the abandoned building where Aaron's body was found. The police records include a statement from a witness who saw Moore enter the abandoned building around 7:00 p.m. on the night of the murder, which is around the same time that Petitioner and Michael Bies were seen in the adjacent park. Moore stated that he knew Aaron and he had looked for him for several hours after being asked to help search by a police officer around 9:00 p.m.; however, Aaron had not been reported missing until 11:00 p.m. Aaron's uncle, William Raines, told police that following Aaron's murder, he noticed Moore acting strangely and that he seemed to be avoiding Aaron's mother. A police officer "looked at it and he said he didn't feel that [Moore's palm print] matched what he had from the crime scene." (*Id*. at 116.) After speaking with Moore, the police determined that they "kind of" believed him and effectively eliminated him as a suspect, particularly after Moore admitted that he had a "shot" memory and his shoes did not match the prints found at the crime scene. (*Id*. at 118–19.)

### iii. Other Potential Suspects

Although Roger Cordray and Raymond Moore were the most notable and talked-about alternative suspects, the undisclosed police files are replete with references to other individuals who may have had some involvement in Aaron's murder. For example, a boy named Larry Peters told the police that Reggie Hetsler approached him at a bus stop in Cincinnati and told him that he killed and raped the little boy along with his brother, Steve Pence. Several undisclosed documents concerned Garland Inman, an individual who had previously been adjudicated a juvenile delinquent for the sexual assault of several family members. Inman had recently been released from juvenile detention, was seen by a named, identified witness near the scene of the crime on the night of the murder, and a number of individuals believed he might have been involved in the crime. Another suspect was Claude Justice, who was the subject of a "crime-stoppers" tip. An anonymous caller reported that Justice is a homosexual man who often propositioned young boys for sex. The tipster stated that he had seen Justice on prior occasions emerge from the building where Aaron was found, often followed by a boy. Several witnesses, including Aaron's uncle Clayton Raines, believed that a man named Luther Hatton had been involved in Aaron's murder because he had a violent criminal history, had been seen near the abandoned building, and mysteriously disappeared after a night of drinking around 10:00 p.m. on the night of the murder. Additionally, according to an ex-convict, word around a local prison was that Hatton had killed Aaron. An anonymous tipster referenced Cody Duffey acting strangely, harassing "neighborhood kids," and carrying a crowbar. The tipster said that Duffey had approached her after Aaron's murder and asked her what she thought she might do if someone had killed her child. Duffey's cold demeanor led her to believe that Duffey knew something about the murder. Raines also mentioned a man named Carl Miller to the police. Raines believed Miller might have been involved because he wanted to get out of town quickly on the night Aaron was murdered.

### b. Impeachment of the State's Witnesses

The state offered the testimony of Aaron's brother, Dallas Hayes, but did not disclose that he had failed a polygraph examination and that the polygraph operator believed that Dallas "was lying on all questions that had to do with Aaron's death." (J.A. at 177.) However, as the district

court found, Ohio has long prohibited the admission of polygraph evidence unless both the prosecutor and defendant agree to admission and numerous safeguards are observed by the trial judge. *See State v. Souel*, 372 N.E.2d 1318, 1321-23 (Ohio 1978). Therefore, it is unlikely that the polygraph evidence would have been admissible, even if the State had disclosed its existence to Petitioner.

A Crime Stoppers tip sheet showed that an anonymous tipster believed the police should look into Hayes because he had been playing in the abandoned building where Aaron's body was found only five days before the murder. Additionally, Petitioner asserts that he is entitled to access to a statement by one of Hayes' friends, who stated that Hayes wanted more freedom and wished that his mother would spend more time with him. However, in that same statement, the friend stated that Hayes loved his brother and would not let anything happen to him.

### c.    Evidence Undermining the State's Theory of the Case

Petitioner also points to undisclosed evidence that Aaron had been seen in the abandoned building in the past, which contradicts the state's argument at trial that Aaron was afraid of the dark and would not have entered the building unless coerced by another person. Although the question of how Aaron entered the building appears largely irrelevant to Petitioner's guilt or innocence, it potentially undermines the state's narrative of the crime and contradicts details provided in Petitioner's statements to the police.

Next, Petitioner argues that the state's timeline of events is contradicted by undisclosed evidence. Specifically, Petitioner identifies numerous witness statements placing Aaron at a local ice cream stand as late as midnight on the night of the murder. This information was garnered by the police from firsthand accounts of named, identified people in the neighborhood. Although the state never definitively established a timeline of Aaron's movements on the night of the murder and the medical examiner could not determine a time of death, the state did present evidence that Petitioner and Bies were last seen in the park adjacent to the abandoned building around 7:00 p.m., and Aaron's brother Hayes testified that he last saw Aaron in the evening before it became dark outside. By suppressing evidence that numerous witnesses had seen Aaron later that evening, the state likely reinforced its case against Petitioner by suggesting that he and Aaron were last seen at approximately the same time. Therefore, this undisclosed

contradictory evidence could have been used by the defense to disrupt the state's narrative of the crime.

**4.      Analysis**

**a.      Admissibility of Undisclosed Evidence**

The state's primary argument against the materiality of the undisclosed evidence in this case is that much of it is inadmissible hearsay and could not have led to the discovery of admissible evidence. As the Supreme Court and this Court have explained, without some indication of admissibility, such evidence cannot be considered material for purposes of *Brady*. *See Ogden*, 685 F.3d at 605. And this indication cannot be merely speculative. *Wood*, 516 U.S. at 6. The magistrate judge concluded that "[m]uch of the alleged *Brady* material is nothing more than rumor, hearsay, hearsay upon hearsay, hearsay upon hearsay upon hearsay, or worse. Gumm has not explained how any of that 'evidence' would have been rendered admissible in court, or how it would have led to admissible evidence." *Gumm*, 2009 WL 7785750, at *24. The district court did not adopt this portion of the magistrate judge's report and instead concluded that while it agreed that "much of the undisclosed evidence was itself inadmissible, . . . that does not necessarily mean that it would not lead to admissible evidence or that it was not subject to disclosure." *Gumm*, 2011 WL 1237572, at *6.

In *Wood*, a habeas petitioner alleged that the state had violated *Brady* by failing to disclose the results of a polygraph examination that could have been used to impeach a witness. 516 U.S. at 5-6. The Ninth Circuit granted the writ, finding that although the polygraph results were themselves inadmissible, their disclosure could have led to admissible evidence or affected defense counsel's preparation for trial. The Supreme Court reversed, finding that neither the Ninth Circuit nor the petitioner could identify precisely how the trial could have been affected, or admissible evidence discovered, had the admittedly inadmissible polygraph results been disclosed. *Id*. at 6-7. The Court further reasoned that the results would have had no material effect under *Brady* because the remainder of the evidence against the petitioner was overwhelming.

Courts applying *Wood* have rejected the writ when a single piece of inadmissible evidence such as a polygraph examination or hearsay statement was not disclosed by the state, concluding that the result of the trial could not have been altered by the nondisclosure of only inadmissible evidence. *See, e.g.*, *Hutchison v. Bell*, 303 F.3d 720, 743 (6th Cir. 2002) (addressing a single hearsay statement). However, this case is not one where a petitioner is complaining about the failure to disclose a single inadmissible statement or polygraph test. On the contrary, Petitioner alleges that the state failed to disclose a small mountain of favorable evidence that he and his counsel would have used to undermine the prosecution's case. Some of this evidence consists of rumors and double-hearsay statements which would likely have been inadmissible at trial, but much of the evidence could very well have been admitted or clearly led to the discovery of admissible evidence. To prevail on a *Brady* claim, a petitioner need only show that the undisclosed evidence was "likely admissible under Ohio law." *Wogenstahl*, 668 F.3d at 325 n.3. Of course, when subject to AEDPA deference, it must be that any reasonable jurist would believe that the inadmissible evidence would lead to admissible evidence. That is clear in this case.

First, Cordray's various confessions would have come into evidence in some manner had Petitioner known about the statements. Petitioner would have called Cordray to testify and three things could have happened: (1) Cordray could have testified consistent with his prior statements, thereby confessing in court to Aaron's murder; (2) Cordray could have denied murdering Aaron, in which case, his prior confessions could come in by way of impeachment, as prior inconsistent statements under Ohio Rule of Evidence 613; or, perhaps most likely, (3) Cordray would not have appeared or would have appeared but asserted his Fifth Amendment privilege against self-incrimination. In this third scenario, Cordray would have been unavailable under Ohio Rule of Evidence 804(A)(1) such that his prior confessions could have come in as statements against interest under Ohio Rule of Evidence 804(B)(3). *See State v. Landrum*, 559 N.E.2d 710, 719-20 (Ohio 1990). Rule 804(B)(3) permits an unavailable declarant's statement to be admitted if it "tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true," if that statement is accompanied by "corroborating circumstances [which] clearly indicate the trustworthiness of the statement." In *Landrum*, the

Ohio Supreme Court found sufficient corroborating circumstances where the declarant "spontaneously" confessed shortly after a murder and there was additional evidence tying the declarant to the murder. 559 N.E.2d at 720 (citing *Chambers v. Mississippi*, 410 U.S. 284, 300-01 (1973)).

Like in *Landrum*, Cordray's confessions were spontaneous: he walked up to the Steeles and told them that he killed "the little kid" and bragged to others in the neighborhood about killing Aaron. Additionally, other reports place Cordray near the scene of the crime and gave him motive for killing Aaron. Therefore, a court would find that there were sufficient corroborating circumstances to render Cordray's confessions admissible. *See Landrum*, 559 N.E.2d at 720. Further, the fact that Cordray had a similar palm print to the one left at the scene could have been admitted by calling the forensic investigator, and Petitioner could have called Putteet to testify about witnessing Aaron teasing Cordray on the night in question.

Additionally, much of the evidence given to the police was in the form of eyewitness statements from named, identified individuals whose testimony would be admissible at trial. Had Petitioner known of the existence of these witnesses, he could have offered testimony of the following: (1) Roger Cordray was known to sleep in the abandoned building where Aaron's body was found; (2) a group of people was seen on the night of the murder "messing with" Cordray in a nearby alley; (3) Anthony Steele observed that Cordray's hands and knuckles were scraped; (4) there were "some similarities" between Cordray's palm print and the print recovered at the crime scene; (5) Raymond Moore lived in the abandoned building where Aaron's body was discovered at some point; (6) Moore was seen entering the building several times on the night of the murder; (7) Moore was acting strangely and avoiding Aaron's mother; (8) Garland Inman, a convicted sex offender, was seen near the crime scene on the night of the murder; (9) Claude Justice was known to use the abandoned buildings for sex; and (10) Luther Hatton had been seen near the abandoned building and mysteriously disappeared around 10:00 p.m. on the night of the murder. None of this was inadmissible as hearsay or for any other reason.

Although some of the evidence against the multiple other suspects might have been inadmissible, the fact that police had received reports about multiple other suspects could have been introduced at trial to call into question the thoroughness of the investigation. Therefore,

contrary to the magistrate judge's conclusion that much of the evidence was immaterial for *Brady* purposes, Petitioner has correctly identified a whole slew of undisclosed, material evidence, much of which was admissible or could easily have led to admissible evidence.

### b.        Consideration of the Evidence in Context

When the prosecution fails to turn over numerous pieces of favorable evidence, the proper focus of *Brady*'s materiality inquiry is on the cumulative effect of the unsuppressed evidence on the jury's verdict. *See Kyles*, 514 U.S. at 436-37. "[T]he omission[s] must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1976).

Considering the quality and quantity of the evidence that the state failed to disclose, the potential for that evidence to have affected the outcome of Petitioner's trial is inescapable. Even armed with only the evidence implicating Roger Cordray, defense counsel would have easily constructed an alternative narrative of the crime. Defense counsel would have been able to establish through eyewitnesses that a group of people, which may have included Aaron Raines, was taunting Cordray near the abandoned building around 11:00 p.m. on the night of the murder. Witnesses place Aaron in the same area at approximately the same time. Cordray, who was known to sleep in the abandoned building, later confessed to numerous people that he had murdered Aaron. After the murder, a witness noticed that Cordray's knuckles were scraped. Even though the police identified "some similarities" between Cordray's palm print and the print found at the scene of the crime—a similarity they were unable to establish with Gumm's print—they eliminated Cordray as a suspect because they simply believed him when he denied involvement in the crime. Taken together, these facts demonstrate that Cordray had the means, motive, and opportunity to murder Aaron. These facts, had they been disclosed, would have provided a compelling counter-narrative to the state's theory of the case and would have called into question the thoroughness of the police investigation.

The capacity for the undisclosed evidence to have affected the outcome of Petitioner's trial becomes even clearer when viewed in light of the small amount of evidence that the state adduced at Petitioner's trial. In fact, the prosecutor admitted in his opening statement to the jury that "the police had very little concrete evidence" and that the case came down to what neighbors had seen that night. (J.A. at 242-43.) The prosecutor framed the case as the neighbors

coalescing around Petitioner as the murderer, but the evidence regarding Cordray and the holes that the neighbors could have poked in the police's timeline would have been directly contradictory to the prosecutor's view of the crime. The state never discovered any physical evidence linking Petitioner to the crime. Instead, the state focused on the fact that Petitioner was seen in a park near the abandoned building around 7:00 p.m. on the night of the murder. However, the relevance of this fact is clearly dubious given the numerous witnesses who saw Aaron much later that night—evidence which was admissible but never disclosed to the defense. Second, the state brought in inflammatory and prejudicial evidence, which this Court finds was unrelated to the crimes and was of questionable validity. Additionally, much of that inflammatory evidence was unreliable hearsay, hearsay upon hearsay, and hearsay upon hearsay upon hearsay.

Finally, and most importantly, the state relied on Petitioner's own confession to the murder. Undoubtedly, a confession "is strong evidence of [] guilt," *Harbison v. Bell*, 408 F.3d 823, 824 (6th Cir. 2005), but there are numerous reasons why a jury would have discounted Petitioner's statements to the police, taking into account Petitioner's diminished mental capacity, especially had it been presented with a compelling alternative theory of the crime based on this mountain of exculpatory evidence. In fact, the only defense witness at Petitioner's trial testified regarding the weakness of Petitioner's confession.

Petitioner's statements to the police were far from overwhelming evidence of his guilt. Petitioner had a questionable capacity to understand what was happening to him, and he likely could not distinguish between what he was told during his encounters with the police and what he actually remembered from the day of the murder. Although the jury was presented with Petitioner's recorded confession, the jury also listened to extensive testimony by the defense's expert witness, who provided strong reasons for discounting Petitioner's confession. Some excerpts from the trial transcript are particularly telling of Petitioner's capacity to provide a reliable confession in this case. Defense counsel asked Dr. Leland for his opinion regarding whether petitioner "would be able to relate the same set of facts accurately two times in a row or several times." (J.A. Vol. II, at 284.) The following colloquy ensued:

A.    He could relate the same type – the same type of facts consistently as long as there was no other intrusion of new facts.

Q.    What would happen if there was an intrusion of new facts?

A.    Then he – then that would contaminate the original memory, and he wouldn't be sure which he was remembering and which he wasn't; that is, it would become jumbled sets of information because he at no time would have been able to synthesize them to make them into a real idea.

Q.    Do you have an opinion with reasonable psychological certainty as to whether or not he would confuse what he had witnessed, he would get them very confused.

A.    Well, it would – if what he had been told concerned what he had witnessed, he would get them very confused.

(*Id.*)  Although the expert witness did not view the recordings of Petitioner's confessions, Dr. Leland did view a recording of Petitioner's walk-through of the abandoned building in which Aaron Raines' body was found.  Dr. Leland was questioned regarding his opinion as to the reliability of the statement Petitioner made during that walk-through.  He stated in response, "I think it's even less reliable . . . .  Because, after watching the tape and comparing the two programs, I find that Darryl primarily was agreeing with the policemen.  As the policemen said things, Darryl would shake his head, meaning yes, and occasionally add things.  But the things that he was asked and added had nothing to do with the testimony in this case." (*Id.* at 285–86.)  Finally, Petitioner's counsel asked Dr. Leland whether, based on his examination of Petitioner and his review of the psychiatric reports, he had an opinion as to whether Petitioner had "the ability to accurately describe an event or facts which occurred ten weeks prior to the time he described them." (*Id.* at 287.)  In response, Dr. Leland responded, "I don't think he has the ability to accurately describe any series of events.  I, for example, asked him what he had been doing in jail for the last three, four days, and he couldn't describe that." (*Id.*)  On cross-examination, Dr. Leland also stated that he did not believe Petitioner "understands what the truth is as you would define the word truth.  You can't judge a damaged brain the way you would judge a normal brain." (R. 170-8, Leland Testimony, at 895.)  Dr. Leland also testified on cross-examination that Petitioner "had difficulty synthesizing what he remembers. . . .  [And t]he problem with depending on that is if you introduce other isolated facts that relate the same situation that he doesn't know, he may remember them also, in which case he doesn't know which the real facts are and which are the ones you've introduced." (*Id.* at 895–96.)

Upon his second petition for post-conviction relief, Petitioner was found to be mentally retarded by the Ohio state courts. According to a psychological evaluation performed by licensed psychologist Dr. David A. Ott, which was submitted to the district court during Petitioner's second evidentiary hearing, mentally retarded individuals use a "cloak of competence" in an "attempt to present themselves as 'normal' (or at least more capable than they actually are) as a means of avoiding the stigma of being identified as mentally retarded." (R. 170-18, Ott Psych. Eval., at 7.) Dr. Ott explained that Petitioner's behavior in response to the officers' questioning was consistent with this notion. (*Id*. ("Although the contact note indicates the officer's perception that 'most of the conversation' was 'macho talk,' Mr. Gumm's apparent efforts to present himself as a capable farmer and pool player despite the significant adaptive deficits he exhibited are consistent with the notion of the *cloak of competence*. . . . Mr. Gumm appeared to the officers as a follower, indicating the ineffectiveness with which he attempted to portray himself as more competent.").)

This observed behavior is very much consistent with the Supreme Court's concerns expressed in *Atkins v. Virginia*, 536 U.S. 304, 320 (2002) about the heightened possibility of false confessions from mentally retarded individuals. The Court recognized that while mentally retarded individuals "frequently know the difference between right and wrong," their impairments cause "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand others' reactions." *Id*. at 318. Mentally retarded individuals are particularly "susceptible to the perceived wishes of authority figures." Morgan Cloud et al., *Words without Meaning: The Constitution, Confessions, and Mentally Retarded Suspects*, 69 U. Chi. L. Rev. 495, 511 (2002). This is true "[e]ven when no direct pressure is exerted on them [because] they may be inclined to make false statements out of a desire to please perceived authority figures." *Id*. "If an authority figure such as a police officer makes it clear to the individual that he wants a confession, even an innocent disabled person may confess so a law enforcement officer will not become angry with him." *Id*. at 512. Additionally, "[w]hen faced with a coercive situation . . . mentally retarded persons generally have difficulty finding refuge even in silence, as often they feel compelled to answer – even when the questions are beyond their abilities." Paul T. Hourihan, *Earl Washington's Confession: Mental*

*Retardation and the Law of Confessions*, 81 Va. L. Rev. 1471, 1493 (1995). This means that "mentally retarded defendants are more likely to confess when placed in an interrogational situation, less likely to give a truthful statement, and yet more likely to be found by a court to have voluntarily, knowingly, and intelligently relinquished his or her constitutional right against self-incrimination." *Id*. at 1494. In fact, as the magistrate judge's report and recommendation recognized, numerous studies reveal that "the mentally retarded are disproportionately represented in 'false confession' cases." *Gumm*, 2009 WL 7785750, at *32 (citing Brandon L. Garrett, *Judging Innocence*, 108 Colum. L. Rev. 55, 88-89 (2008); Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 920, 971 (2008)).

While a jury could have accepted (and did accept in this instance) that Petitioner's confession was genuine, notwithstanding these problems, the jury was not presented with any counter narrative of the crime. Instead, what was placed before the jury was a confession of minimal reliability, inflammatory statements by the prosecutor, heavily prejudicial testimony from Petitioner's former housemates, and hearsay statements lacking any indicia of reliability contained in the psychiatric reports. Although the jury likely viewed Petitioner's confession with some skepticism following this testimony, without a counter narrative of the crime and with all of the egregious "bad acts" evidence that came into the record, the jury likely placed greater weight in the confession than was warranted. In this context, the state's failure to turn over this evidence implicating other individuals in the murder and calling into question the state's own account of the crime can "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

c.    **AEDPA Deference**

Although AEDPA does not apply to Petitioner's *Brady* claim, even if we were confined by the stringent limitations in § 2254(d)(1), habeas relief is still appropriate because no reasonable jurist could find that the disclosure of the small mountain of exculpatory evidence in this case would not undermine confidence in the verdict. In its recent decision in *Woodall*, the Supreme Court clarified application of § 2254(d)(1) as follows:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* [Supreme] Court[] precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.

134 S. Ct. at 1706 (internal citation and quotation marks omitted). Therefore, the Court held, habeas relief is improper where a state court's decision constituted an unreasonable failure to extend clearly established federal law. This holding does not apply in the instant case because Petitioner's *Brady* claim falls directly under the Supreme Court's clearly established law as dictated in *Brady* and its progeny, and does not require an extension of current law. Therefore, even under AEDPA deference, habeas relief is appropriate in this case.

This is not a difficult finding to make. In this case, there was no physical evidence linking Petitioner to the crime. The police were unable to locate Petitioner's shoes to match those to the prints found at the crime scene. Police were also unable to match Petitioner's palm print to the palm print uncovered at the scene. As a result, the prosecutor made his case through Petitioner's demonstrably unreliable confession and egregiously prejudicial and unreliable testimony and hearsay statements contained in the psychiatric reports. On the other hand, the undisclosed evidence, much of which would have been admissible in some form at trial, demonstrated that other suspects were near the scene at the approximate time of the crime. One of those suspects confessed on at least two occasions to two different people. That same suspect who confessed to the crime was seen in the area around the time of the crime, being harassed by a group of kids. That same suspect's palm print had some similarities with the palm print obtained from the scene. Where the evidence against Petitioner was so weak in this case and the undisclosed evidence so strong, it is impossible for this Court to conclude that reasonable jurists could disagree as to whether the undisclosed evidence, when considered together, "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

The Supreme Court found in *Kyles* that "[t]here was a considerable amount of [] *Brady* evidence on which the defense could have attacked the investigation as shoddy." Here, it is no different. Even prior to anyone mentioning Petitioner as a possible suspect, the police had a

great deal of evidence, much of which would have been admissible in some form, showing that other individuals could have been involved in the crime, yet police ended their investigations of these individuals based on little more than a whim that the individuals were being truthful.

Two identified witnesses came forward stating that Cordray had confessed to the murder and two additional people were believed to have heard Cordray confess. Cordray's palm prints were a partial match to the palm prints retrieved at the scene of the crime. Defense counsel could have conducted additional investigation by interviewing Anthony and Theresa Steele, Donna Jones, and Paul Worthington, and calling them during trial to ask about Cordray's confessions. Although the latter two individuals did not provide direct statements to the police, the undisclosed evidence indicates that they overheard Cordray confessing that he killed Aaron Raines. Despite all of this evidence amassed against Roger Cordray, the police officers merely decided they believed his story and ended their investigation into that suspect. After locating Cordray, photographing his shoes, and fingerprinting him, the police interviewed Cordray about his activities on the night of the murder. When he denied knowing Aaron Raines or seeing him that night and indicated that he would never hurt a child, "[t]he author of the investigative summary expressed his belief that Cordray was being truthful, and skepticism that Cordray was involved in Aaron's murder." *Gumm v. Mitchell*, No. 1:98–cv–838, 2009 WL 7785750, at \*20-21 (S.D. Ohio Sept. 28, 2009). Had all of this material been presented to the jury, Petitioner's defense counsel could have attacked as "shoddy" this decision to end the investigation.

Similarly, police received a number of reports implicating Raymond Moore in the crime, including one from Aaron's uncle. Apparently Moore lived in the abandoned building and a witness saw him entering the building around 7:00 p.m. on the night of the murder. Moore made a number of strange and questionable statements to the police regarding his conduct on the night of the murder. Despite all of this evidence, the police simply determined that they "kind of" believed Moore and eliminated him as a suspect, without pressing any further. This evidence would have allowed Petitioner to "undermine the ostensible integrity of the investigation." *Kyles*, 514 U.S. at 447.

This Court is confident that even under AEDPA deference, Petitioner is entitled to habeas relief. The Ohio Court of Appeals unreasonably applied clearly established federal law including

*Brady, Kyles*, and their progeny. A habeas petitioner need not demonstrate that undisclosed *Brady* evidence would have rendered a different outcome in his trial or demonstrated that he was factually innocent. To prevail under *Brady*, a petitioner need only establish that the undisclosed evidence, when considered collectively, "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." The Ohio Court of Appeals' measly statement regarding the merits of Petitioner's *Brady* claim constituted an unreasonable application of clearly established federal law because no reasonable jurist could have found that the disclosure of this small mountain of exculpatory evidence, much of which was admissible or would clearly have led to admissible evidence, would not have undermined confidence in the verdict in this case.

## C.        Petitioner's Prosecutorial Misconduct Claim

In addition to his *Brady* claim, Petitioner asserts that the admission of prior bad acts evidence through testimony and the psychiatric reports and the manner by which the evidence was used in argument constitute prosecutorial misconduct that require the grant of habeas relief.

### 1.        Standard of Review

Before the Ohio Supreme Court, Petitioner asserted that the prosecution's argument pushing for admission of the full psychiatric reports as well as the use of material contained in those reports constituted prosecutorial misconduct. In the same section of Petitioner's merits brief, he asserted a fair trial claim that the trial court improperly admitted Thacker and Baker's testimony. (J.A. at 206 ("It is submitted that the lower courts [sic] admission into evidence testimony as to the Appellant's drinking and sexual habits . . . was clearly prejudicial error.").) In response to those assertions, the Ohio Supreme Court concluded as follows:

> Gumm first challenges the admissibility of testimony elicited from witnesses Phyllis Thacker and Charlotte Baker. . . . Gumm asserts that his chance for a fair trial was irretrievably lost after this testimony [sic]. . . .
>
> We note that the prosecution did not revisit these factual disclosures in its summation or emphasize them in any way thereafter. Even assuming, *arguendo*, that the challenged evidence should have been deemed inadmissible, we find on the basis of the record as a whole that Gumm received a fair trial . . . .

Second, Gumm asserts that the state engaged in prosecutorial misconduct in connection with the testimony of defense witness Dr. Henry Leland. . . .

Gumm argues that admission of the entire packet of materials permitted the prosecution to engage in further misconduct by allowing it to focus on prior bad acts of defendant (past instances of cruelty to animals and an alleged attempt to rape a friend of his sister).

This claim is without merit. Dr. Leland was called as the sole defense witness to show that Gumm's confession to police was not reliable. In response to the prosecutor's question whether the packet of information helped him form the basis of his opinions on Gumm, Dr. Leland stated that the packet "presented the major basis, because when I was able to compare that information with my information, it became clear what the problem was."

[Ohio Rule of Evidence] 703 provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." *See State v. Jones*, 459 N.E.2d 526 (1984), the syllabus of which provides: "Pursuant to [Ohio Rule of Evidence] 703, facts or data upon which an expert bases an opinion must be those perceived by *him or admitted in evidence at the hearing*." (Emphasis added).

While Gumm may have been forced to offer the Court Psychiatric Center packet into evidence to save the testimony of his only witness, the motion by the prosecutor does not constitute prosecutorial misconduct. The Rules of Evidence and relevant precedent support the propriety of the prosecution's motion in this regard.

*Gumm*, 653 N.E.2d at 265-67. Therefore, the Ohio Supreme Court based its prosecutorial misconduct decision solely on Petitioner's asserted claim about the psychiatric reports, and we apply AEDPA deference to this decision.

Petitioner did not argue before the Ohio Supreme Court that the prosecutor's elicitation of and argument concerning Thacker and Baker's testimony constituted prosecutorial misconduct denying him due process of law. Therefore, this claim has not been exhausted in state court. Under normal circumstances, this failure to present the claim to the state court would constitute a procedural default. *Lovins v. Parker*, 712 F.3d 283 (6th Cir. 2013) ("[A] claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule."); *see also In re Abdur'Rahman*, 392 F.3d 174, 186 (6th Cir. 2004) (en banc) (describing this situation as "forfeiture by failure to exhaust"), *vacated on other grounds by Bell v. Abdur'Rahman*, 545 U.S. 1151 (2005). However, the state has explicitly waived the procedural default defense.

In its "Return of Writ," the state "concede[d] that Gumm has not procedurally defaulted the allegation of prosecutorial misconduct of introducing 'other acts' evidence" while also arguing that "Gumm is procedurally defaulted on the remaining claims." (R. 163, Return of Writ, at 206.) As this Court has acknowledged, "[p]rocedural default is normally a defense that the State is obligated to raise and preserv[e] if it is not to lose the right to assert the defense thereafter." *Arias v. Lafler* 511 F. App'x 440, 444 (6th Cir. 2013). Therefore, although Gumm failed to present his claims regarding testimony from Thacker and Baker, he has not procedurally defaulted those claims. And as the Supreme Court has explained "[a] court of appeals is not required to raise the issue of procedural default *sua sponte*. It is not as if the presence of a procedural default deprived the federal court of jurisdiction, for [the Supreme] Court has made clear that in the habeas context, a procedural default, that is, a critical failure to comply with state procedural law, is not a jurisdictional matter." *Trest v. Cain*, 522 U.S. 87, 89 (1997).

AEDPA deference is warranted only where "a federal claim was adjudicated *on the merits* in State court." *Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013) (emphasis in original). "When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court [or never presented to the state court], § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge." *Id.* "Consequently, where a state court has not previously ruled on the merits of a claim, we apply the de novo standard of review." *Murphy v. Ohio*, 551 F.3d 485, 494 (6th Cir. 2009).

Therefore, this Court applies AEDPA deference to the state court's determination regarding the prosecutor's motion to admit the psychiatric reports and the use of hearsay statements contained in the reports in rebuttal closing arguments, but we apply *de novo* review to Petitioner's claims regarding testimony from Thacker and Baker because the state court never considered those claims.

## 2. Clearly Established Law

A prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935), *overruled on other grounds by Stirone v. United States*, 361 U.S. 212 (1960). To achieve this goal, the prosecutor

"may prosecute with earnestness and vigor . . . . But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* "It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge, are apt to carry much weight against the accused when they should properly carry none." *Id.* In particular, statements meant to inflame the passions of the jury are often considered improper. *Slagle v. Bagley*, 457 F.3d 501, 518 (6th Cir. 2006). Additionally,

> the State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.

*Michelson v. United States*, 335 U.S. 469, 476 (1948).

At the same time, this Court recognizes that our review of alleged prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power that [we] would possess in regard to [our] own trial court." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (internal quotation marks omitted). *See also Smith v. Phillips*, 455 U.S. 209, 221 (1982) ("Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." When this Court reviews a prosecutorial misconduct claim, "it is not enough that the prosecutor's [conduct was] undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Instead, that conduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* Further, the Supreme Court has noted that "the *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

In *Parker*, the Supreme Court instructed that this Court may not consult its own precedent to decide under AEDPA whether a state court's adjudication on the merits was contrary to clearly established federal law. 132 S. Ct. at 2155 (internal citation and quotation marks omitted) ("[C]ircuit precedent does not constitute clearly established Federal law . . . . It therefore cannot form the basis for habeas relief under AEDPA."). The Court explained that its "highly generalized standard for evaluating claims of prosecutorial misconduct set forth in *Darden* bears scant resemblance to the elaborate, multistep test employed by [our Court]." *Id*. Therefore, because our review of Petitioner's claim regarding admission and argument of hearsay statements in the psychiatric reports is subject to AEDPA deference, we must apply the "highly generalized standard for evaluating [such claims] set forth in *Darden*" and its progeny, not our own four-factor test. *Id*.

In *Darden*, 477 U.S. at 182, the Supreme Court held that the petitioner's due process right was not violated because "[t]he prosecutor's argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent." The Court was also convinced by the fact that many of the prosecutor's objectionable statements were responsive to arguments initially asserted by defense counsel and the trial court properly instructed the jurors that the arguments of counsel were not evidence. The Court also found particularly compelling the fact that the "weight of the evidence against [the] petitioner was heavy." *Id*. Similarly, in *Donnelly*, the Supreme Court found telling the fact that "[c]onflicting inferences ha[d] been drawn from the prosecutor's statement by the courts below," and concluded that it was "by no means clear that the jury did engage in the hypothetical analysis suggested by the majority of the Court of Appeals, or even probable that it would seize such a comment out of context and attach this particular meaning to it." 416 U.S. at 643-44. Additionally, in *Donnelly*, the prosecutor emphasized that his own argument did not constitute evidence and the trial judge admonished the jury to ignore the prosecutor's improper remark. The Court concluded that "[a]lthough some occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect, the comment in this case is hardly of such character." *Id*. at 644. "The consistent and repeated misrepresentation of a dramatic exhibit in evidence may profoundly impress a jury and may have a significant impact on the jury's deliberations. Isolated passages of a prosecutor's argument, billed in advance to the

jury as a matter of opinion not of evidence, do not reach the same proportions. . . ." *Donnelly*, 416 U.S. at 646-47. *See also Romano v. Oklahoma*, 512 U.S. 1, 13-14 (1994) (concluding that a prosecutor's misconduct did not warrant reversal because the trial court provided clear instructions to the jurors and the nature of the evidence made it "impossible to know how [it] might have affected the jury.").

**3. Analysis**

**a. Prior Bad Acts Contained in the Psychiatric Reports**

The Ohio Supreme Court concluded that the psychiatric reports were properly admitted into evidence and that the prosecutor did not act improperly in arguing the information contained in the reports. Even if this was proper under the Ohio Rules of Evidence, it does not mean that the prosecutor was free to use the materials contained in that packet however he wished. The manner in which he used those materials was improper in this case. The prosecutor aggressively pushed to have the reports admitted into the record as support for the defense expert's testimony, and then turned around and argued the information contained in those hearsay statements as though it was unrebutted, reliable fact. Unlike some of the Supreme Court's cases described above, this case does not concern unclear statements in a closing argument that can be interpreted in different ways. Additionally, this case is not one in which the trial judge clearly instructed the jurors regarding propensity evidence and the value of hearsay statements.

A portion of the prosecution's closing argument bears repeating:

Charles recalls hearing a story from his wife of an incident where [Petitioner] threw a raccoon into a five-gallon bucket of paint. Charles admits that [Petitioner] was cruel to animals and would frequently kick them. On one occasion he recalls [Petitioner] planning to kick the neighbor's dog to death before he was stopped by the dog's owner. Begin to fit the personality?

After this offense occurred, he did report an incident where [Petitioner] attempted to get one of their nephews to suck him. Begin to fit the pattern? These are from people who are not police officers, not prosecutors. They're people, if anything, who should be in the defense. They interviewed Betty Gumm. You heard what she said. . . . Betty recalls [Petitioner] tried to rape a friend of hers; however, there was not enough evidence on this occasion to convict him. He was described as rowdy, arguing, and fighting when he was drunk. Does that fit the pattern? Betty recalls [Petitioner] as always being cruel to animals.

> On one occasion, [she] recalls [Petitioner] throwing her sister Karen's daughter's dog into a space heater and the dog dying. On another occasion, Betty recalls [Petitioner] putting a spoon on the stove until it got hot and then putting it on their nephew's arm.

(App. at 308–09.) Although unrelated and removed in time from the crimes in this case, the prosecution put forth unreliable hearsay statements regarding cruelty to animals and bizarre sex acts to suggest that Petitioner had a propensity to commit acts like the crimes in question. This evidence was clearly meant to "inflame the passions of the jury," *Slagle*, 457 F.3d at 518, and paint Petitioner as a sexual deviant and animal-killer who deserved to be removed from society.

While it is clear that the statements contained in the psychiatric reports were extremely prejudicial and the prosecutor's decision to argue the hearsay statements as fact to the jury ought to be "universally condemned," it is difficult to find under the highly restrictive standards set forth by the Supreme Court's interpretation of AEDPA that this misconduct rises to a level that, given the "leeway" of the *Darden* standard, no "fairminded jurist" could have reached the conclusion that the Ohio Supreme Court did in this case. *See Richter*, 131 S. Ct. at 786. The magistrate judge and district court's contrary result rested on the application of the multi-factor prosecutorial misconduct test from this Court's decision in *Bowling v. Parker*, 344 F.3d 487 (6th Cir. 2003). *See Gumm.* 2009 WL 7785750, at *39, 43. Post-*Matthews*, this was clearly erroneous. 132 S. Ct. at 1255-56. Further, the magistrate judge spent time analyzing the propriety of the prosecutor's motion to admit the psychiatric reports under the Ohio Rules of Evidence. *Gumm*, 2009 WL 7785750, at *43. This was also erroneous because evaluation of a state's decision on its evidentiary rule is "no part of a federal court's habeas review of a state conviction." *Estelle*, 502 U.S. at 67. In light of the fact that the Ohio Supreme Court (rightly or wrongly) determined that the prosecutor's motion was proper under Ohio evidentiary rules, it is difficult to say, even considering the inflammatory items included in the report, that no reasonable jurist could agree with the Ohio court's conclusion that the prosecutor's conduct did not violate Petitioner's due process rights. Therefore, this Court cannot find, subject to AEDPA deference, that Petitioner is entitled to habeas relief based solely on the prosecutor's motion to admit hearsay statements contained in the psychiatric reports.

### b.     Testimony by Thacker and Baker

Because Petitioner's claims regarding testimony by Thacker and Baker were not presented to the Ohio courts, the state courts did not adjudicate those claims on the merits. As a result, we review those claims *de novo*. *See Robinson*, 663 F.3d at 822-23. Therefore, this Court must determine whether the prosecutor's remarks and actions surrounding testimony by Thacker and Baker, "in the context of the entire trial, were sufficiently prejudicial to violate respondent's due process rights." *Donnelly*, 416 U.S. at 639.

Under this standard of review, this Court has "employ[ed its own] two-part test to determine whether prosecutorial misconduct require[d] a new trial." *Cristini v. McKee*, 526 F.3d 888, 899 (6th Cir. 2008). Again, "[w]e are well aware that we possess no supervisory powers over state trial proceedings and that our scope of review over allegedly prejudicial arguments by state prosecutors is narrow. Prosecutorial argument must be so egregious so as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979). On *de novo* review, our first step is to determine whether the challenged conduct and remarks by the prosecution were improper. *Boyle v. Billion*, 201 F.3d 711, 717 (6th Cir. 2000); *United States v. Collins*, 78 F.3d 1021, 1039 (6th Cir. 1996). If we find that the prosecutor's conduct was improper, "we then 'look to see if [it was] flagrant and warrant[s] reversal.'" *Boyle*, 201 F.3d at 717 (quoting *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999)). To make such a determination, we examine four factors: "1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused." *United States v. Francis*, 170 F.3d 546, 549–50 (6th Cir. 1999). The first of these factors incorporates a consideration of "whether the trial judge gave an appropriate cautionary instruction to the jury." *United States v. Monus*, 128 F.3d 376, 394 (6th Cir. 1997). And when assessing these factors, "the court must view the totality of the circumstances." *Hanna v. Price*, 245 F. App'x 538, 544 (6th Cir. 2007).

### i.     Impropriety of the Prosecution's Conduct

In the instant case, the prosecutor's conduct was "so deplorable as to define the term 'prosecutorial misconduct.'" *Boyle*, 201 F.3d at 717. Although this Court has previously stated

that "[a] prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings," *Cristini*, 526 F.3d at 900, this Court has also held on a number of occasions that "[w]hen a prosecutor dwells on a defendant's bad character to prove that he or she committed the crime charged, we may find prosecutorial misconduct," *id.* at 899. *See also Walker v. Morrow*, 458 F. App'x 475, 490 (6th Cir. 2012) (internal quotation marks omitted) ("[T]his Court has concluded that a prosecutor commits misconduct by making an animated recitation of properly-admitted character evidence . . . and by asserting that members of the jury should be afraid to run into [the defendant] at night . . . .").

In *Cook v. Bordenkircher*, 602 F.2d 117, 120 (6th Cir. 1979), this Court concluded that a prosecutor's conduct was improper where the prosecutor's closing argument constituted a "persistent Ad hominem attack on the petitioner's character." The prosecutor's attack on the petitioner's character was particularly egregious because it "pervade[d] the closing argument" and "[t]he prosecutor continually portrayed the petitioner as a lowlife who had to be kept from society." *Id.* And in *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000), we confronted a situation in which the prosecutor put forth a "bad character argument[] that the alleged criminal acts 'fit' the evidence of [the defendant]'s character and lifestyle." The Court concluded that "while the evidence as to Washington's character was admissible for certain limited purposes, the prosecutor went far beyond the bounds of permitted conduct when presenting that evidence to the jury" by "impl[ying] that the jurors should consider Washington's unseemly character when rendering their verdict; in his rebuttal closing argument, he explicitly urged them to do so." *Id.* at 699-700. Although it is not improper merely to direct a jury's attention to properly admitted evidence, it can be improper for a prosecutor to use that evidence to suggest that a criminal defendant had a propensity to commit the charged crimes. *Id.* at 700 (finding that the misconduct was severe and improper because the "character attack pervaded the closing argument and rebuttal.").[7]

---

[7]On the other hand, in *Flood v. Phillips*, 90 F. App'x 108, 120 (6th Cir. 2004), this Court declined to find that a prosecutor's remarks pertaining to a habeas petitioner's alleged homosexual tendencies were improper. The Court found particularly compelling the fact that the prosecutor had qualified his statement about the petitioner's tendencies, "conced[ing] to the jury that his remarks were speculative and that he had no evidence, thereby mitigating their harmful effect." *Id.*

As the above-referenced case law demonstrates, the prosecutor's acts and remarks in this case were improper. Although the Ohio trial court overruled defense counsel's objections to admission of Thacker and Baker's testimony, which was likely error in this case, the intentional and deliberate manner by which the prosecutor obtained the testimony and the ultimate propensity argument made during his rebuttal closing argument constitute improper conduct. Here, the conduct was improper because the prosecutor intentionally elicited evidence of questionable validity that is far more prejudicial than probative. The prosecutor knew what testimony he was searching for and did not stop until he obtained the exact language he sought from Thacker. Additionally, the prosecutor was aware of the questionable veracity of that testimony because he knew Petitioner had not only discussed "fucking a horse" but had also indicated that the horse was talking to him during that same conversation with Thacker. The prosecutor followed the same pattern with Baker—he pushed Baker in an attempt to get the exact statement he wanted on the record, even though Baker could not recall that statement ever having been made by Petitioner. Just as he pushed for Thacker to say "fucked the horse," the prosecutor pushed Baker to say that Petitioner had previously stated he was "so hard up he'd do it to anyone." However, Baker was not willing to say those words and the prosecution pushed too far. Instead, he improperly got them on the record through his leading question.

The prosecutor then used this evidence to depict Petitioner as an overly-confident sexual deviant who has a propensity to have sex with little boys and commit crimes such as those in this case. In fact, the prosecutor injected an implication in his rebuttal closing argument that was inappropriate and unfounded on the record. While there was questionable evidence of Petitioner's sex with women, men, and a horse, there was absolutely no evidence on the record that Petitioner ever had sex or was motivated to have "sex with little boys." (J.A. at 315.) *See Walker*, 458 F. App'x at 490 (internal quotation marks omitted) ("[A] prosecutor's act of misrepresenting facts in evidence is improper, since doing so may profoundly impress a jury and may have a significant impact on the jury's deliberations.").

####         ii.        Flagrancy of the Prosecution's Conduct

Having found that the prosecutor's remarks were improper, we move on to determine whether the remarks were so flagrant as to warrant reversal, considering the four factors set forth in *Francis*, *supra*, and *Bowling*, *supra*.

The only thing given AEDPA deference in this instance is the Ohio Supreme Court's decision that the prosecutor's conduct with respect to the psychiatric reports does not constitute prosecutorial misconduct. What the Ohio Supreme Court did not address, however, is whether the prosecutor's elicitation and use of Thacker's and Baker's testimony in isolation constitute prosecutorial misconduct or whether the cumulative effect of those statements and the prosecutor's arguments regarding those statements amounts to prosecutorial misconduct. In fact, on *de novo* review, this Court's test directs us to consider a series of statements and actions to determine the flagrancy of the prosecutor's conduct. In this case, we are not left to guess whether the prosecutor's egregious acts, viewed in the context of the rest of the evidence presented at trial, were flagrant and whether habeas is therefore an appropriate form of relief.

In the instant case, the prosecutor relentlessly pressed the witnesses to obtain specific testimony, testimony which was highly inflammatory and unreliable. The prosecutor then used the inflammatory information contained in Thacker and Baker's testimony in the rebuttal closing arguments to the jury to argue that Petitioner is a sexual deviant who likely committed the crimes:

> Sex is the motive in this particular case, and it fits the profile. . . . Darryl likes to shoot pool, and he likes to have sex. It's probably a strange hobby, but it fits. Sex is a hobby, and he likes to have it every day: Sex with a woman; sex with a man, which he's had on fifteen to twenty occasions according to the evidence; *sex with animals, according to Phyllis Thacker*; and sex with little boys.

(J.A. at 315 (emphasis added).)

It is clear that the prosecutor's misconduct was flagrant and severe. Like the misconduct in *Bordenkircher* and *Hofbauer*, the prosecutor intended to mislead the jury and prejudice the defendant by using highly inflammatory and prejudicial evidence, much of which was known to be of questionable reliability, to assert that Petitioner had a propensity to commit the acts in

question. Particularly, with regard to Thacker's testimony, the statement that Petitioner had mentioned having had sex with a horse was unreliable due to the fact that in that same conversation with Thacker, Petitioner also stated that the horse had spoken to him. The prosecutor then reminded the jury of this evidence by arguing its truth in his rebuttal closing argument, which also included reference to the subject of Baker's testimony. The prosecutor intended to prejudice the jury against Petitioner by portraying him as a sexual deviant whose character aligned with the crimes in this case.

These statements were neither isolated nor innocently placed before the jury. In *Bordenkircher*, although this Court found that the prosecutor's conduct was improper, the Court concluded that the conduct was not so flagrant as to require reversal. The Court found particularly compelling the fact that the prosecutor's improper arguments were made in response to arguments first asserted by defense counsel, "diminish[ing] the allegations made concerning a due process violation." *Bordenkircher*, 602 F.2d at 121. In this case, on the other hand, the prosecutor's elicitation of prejudicial testimony and propensity arguments were part of a series of deliberate and improper statements that were used at multiple points throughout the trial to convince the jury that Petitioner had a propensity to commit the alleged crimes. The prosecution's propensity-driven argument was deliberate and was not made in response to defense counsel's arguments. It was "part of a calculated effort used to evoke strong . . . emotions" against Petitioner. *United States v. Payne*, 2 F.3d 706, 715 (6th Cir. 1993). Thacker's damaging testimony was one of the first things heard by the jury in this case and one of the last things argued to the jury in the prosecution's rebuttal. It is clear from the prosecutor's line of questioning that he had interviewed Thacker before trial and knew which stories from her interview he wished to place before the jury. From the beginning, the prosecutor intended to infect Petitioner's trial with prejudicial and unreliable evidence. When Thacker was uncomfortable using the harsh and damaging language sought by the prosecutor, he continued to push. He pushed Thacker until she reluctantly stated to the jury that Petitioner told her that he "fucked the horse." Although the prosecutor moved on from that subject after obtaining the language he was searching for, he pressed Baker in a similar manner, even putting words on the record that she denied ever having heard Petitioner say. The discussion of irrelevant prior bad acts did not end there, however. The prosecution's rebuttal closing argument included an

express reference to Thacker's testimony and indirect references to the subject of Baker's testimony.  The prosecution did not simply move on from the damaging testimony; he reminded the jurors of it through his propensity argument just before they left for deliberations.

Additionally, as explained above, the other evidence against Petitioner was weak.  This Court's cases granting and denying prosecutorial misconduct claims seem to be distinguishable largely on one ground: the total strength of the evidence against the accused.  In *Bordenkircher*, for example, this Court found particularly important the fact that "proof of guilt was overwhelming.  The petitioner was effectively caught red handed."  602 F.2d at 120.  In *Cristini*, too, although this Court found that "some of the prosecutor's opening and closing argument went beyond the bounds of the ruling that permitted other acts evidence to establish Defendant's identity," it concluded that any error in connection with the misuse of that evidence was harmless because the rest of the evidence was so strong against the defendant that "the prior bad acts evidence and the propensity arguments did not have a substantial or injurious effect on the jury's verdict.  526 F.3d at 900.

In the instant case, on the other hand, there was no physical evidence linking Petitioner to the crime.  There were no eyewitnesses to the murder.  In fact, the only evidence outside of the challenged improper bad acts testimony was Petitioner's confession, non-probative statements by Petitioner's former female housemates that he began acting strange, looked at them in awkward ways, frequently talked about sex with women, and became hateful when he drank alcohol, and the psychiatric reports argued as fact in the prosecutor's closing argument.  Although we must find under the stringent requirements of AEDPA that the prosecutor's argument regarding the psychiatric reports did not constitute prosecutorial misconduct, that does not prevent us from viewing the hearsay statements to determine the credibility, reliability, and strength of this evidence against Petitioner under the fourth factor of our test.  The evidence contained in these reports had little to no reliability due to the many layers of hearsay.  For example, Charles Bray relayed a story to a social worker about Petitioner having tried to convince a relative to "suck him."  However, Bray could not provide additional information because he did not himself observe the incident and was only told about the purported behavior by another individual.  Bray also recalled hearing a story from his wife about Petitioner throwing a raccoon into a bucket of

paint.  The report, however, does not indicate whether Bray's wife observed the incident herself or heard about it from another party.  Without more information and adequate indicia of reliability, these hearsay statements provided very little support for the prosecution's case.  Additionally, most of the information contained in the reports, such as the prejudicial stories of cruelty to animals, is unrelated to the crimes in this case.  Even if the stories were accompanied by an adequate indicia of reliability, Petitioner's cruelty to animals is unrelated to the attempted rape and murder of a ten-year-old boy.  As a result, the psychiatric reports do not provide strong support for the prosecution's case.  Finally, the strongest evidence in the record supporting Petitioner's conviction is his taped confession.  However, as explained above, Petitioner's confession is not reliable and cannot be given great weight in this case.

In *Berger*, 295 U.S. at 89, the Supreme Court was confronted with a situation in which the conduct of the prosecuting attorney was not "slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential."  The Court concluded that "[i]f the case . . . had been strong, or . . . the evidence of his guilt overwhelming, a different conclusion might be reached."  *Id*.  However, finding that the case against the petitioner was weak, the Court granted habeas relief.  Here, unlike *Cristini* and *Bordenkircher*, the case against Petitioner was so weak and the prosecutor's misconduct so "pronounced and persistent" that it too had a "probable cumulative effect upon the jury which cannot be disregarded as inconsequential."  *Id*.

It is difficult for this Court not to conclude under *de novo* review that the prosecutor's conduct in this case was "calculated to incite the passion and prejudices of the jurors" and "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006) (internal quotation marks omitted). Therefore, habeas relief is proper on Petitioner's prosecutorial misconduct claim.

## III.

## CONCLUSION

We recognize that § 2254(d) is not "a substitute for ordinary error correction through appeal," but is, instead, a "guard against extreme malfunctions in the state criminal justice

systems." *Richter*, 131 S. Ct. at 786 (internal quotation marks omitted). This is such a case in which extreme malfunctions in the state criminal justice system prejudiced Petitioner and caused him to suffer extreme violations of his constitutional rights. For the foregoing reasons, we **AFFIRM** the district court's grant of a conditional writ of habeas corpus.

---

**CONCURRENCE IN PART AND IN THE JUDGMENT**

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and concurring in the judgment. I concur in all but Part II.B.4.c. of the majority's opinion. As the majority explains and the magistrate judge extensively documented, Ohio courts consistently have interpreted Ohio Revised Code § 2953.23(A) to deprive courts of subject-matter jurisdiction if its requirements are not met. *See Gumm v. Mitchell*, No. 1:98-CV-838, 2009 WL 7785750, at *18 (S.D. Ohio Sept. 28, 2009) (collecting cases). One of its requirements—that "[t]he petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted"—requires a court to assess the merits of a claim. Ohio Rev. Code § 2953.23(A)(1)(b). This requirement does appear to lead to an odd outcome. As noted by the magistrate judge, "[t]aken to its logical conclusion, that interpretation [taken by the Ohio Court of Appeals] leaves the state courts with jurisdiction only over winning claims." *Gumm*, 2009 WL 7785750, at *18.

We are not in a position to question, however, Ohio's interpretation of its own statute. When interpreting *federal* statutes and rules, we have been directed by the Supreme Court to look critically to determine whether a rule is actually jurisdictional or more accurately described as claims-processing. *See, e.g.*, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010). But when a state court interprets a *state* statute as jurisdictional, we are bound by principles of comity and federalism to defer to that interpretation. *See, e.g.*, *Vroman v. Brigano*, 346 F.3d 598, 604 (6th Cir. 2003) ("This court, however, does not function as an additional state appellate court reviewing state-court decisions on state law or procedure."); *Israfil v. Russell*, 276 F.3d 768, 771 (6th Cir. 2001) ("Principles of comity require federal courts to defer to a state's judgment on issues of state law and, more particularly, on issues of state procedural law. Because state courts are the final authority on state law, federal courts must accept a state court's interpretation of its statutes and its rules of practice.") (internal citations omitted).

Ohio courts hold that "[i]f a court acts without jurisdiction, then any proclamation by that court is void." *State ex rel. Tubbs Jones v. Suster*, 701 N.E.2d 1002, 1007 (Ohio 1998). After appearing to discuss briefly the merits of Petitioner's *Brady* claim, the Ohio Court of Appeals "h[e]ld that the common pleas court properly declined to entertain" the Petitioner's *Brady* claim because "Gumm failed to satisfy the R.C. 2953.23 jurisdictional requirement of outcome-determinative constitutional error." *State v. Gumm*, 864 N.E.2d 133, 142 (Ohio Ct. App. 2006). Therefore, under Ohio law, the Ohio Court of Appeals' discussion of the merits of Petitioner's *Brady* claim is void and is not a ruling "on the merits" for the purposes of AEDPA. *See* 28 U.S.C. § 2254(d). The State's attempt to characterize the Court of Appeals' brief merits discussion as an alternate holding on federal grounds ignores this clearly established rule of Ohio law, and improperly analogizes to alternate merits holdings when a court finds a claim procedurally barred. Appellant Br. at 26. Declining to evaluate a claim that is procedurally barred is manifestly different than determining that a claim cannot be evaluated because of a lack of subject-matter jurisdiction. In the latter situation, a court cannot give an alternate merits ruling under Ohio law that has any legal effect.

As I find that the Ohio Court of Appeals' decision regarding Petitioner's *Brady* claim was not a ruling on the merits, and therefore it is subject to de novo review, I do not think it is necessary to reach whether the Court of Appeals' decision was unreasonable assuming AEDPA deference applies.